# Richmond

SURF REALTY CORPORATION v. JAMES J. STANDING, TRADING
AS PRINCESS ANNE LUMBER COMPANY AND OTHERS.

November 30, 1953.

Record No. 4082.

Present, Eggleston, Spratley, Miller, Smith and Whittle, JJ.

The opinion states the case.

*Ashburn, Agelasto & Sellers*, for the appellant.

*P. W. Ackiss, William L. Parker* and *James G. Martin & Sons*, for the appellees.

Sмiтн, J., delivered the opinion of the court.

This case is here on appeal from a decree entered June 14, 1952, which upheld the validity of several mechanics' liens upon certain real estate of Surf Realty Corporation, appellant, located near the city of Virginia Beach, and awarded judgments aggregating $11,984.89 to four of the appellees.

The property here involved consisted of land and buildings situated adjacent to the beach, and was operated by Surf Beach Club, Incorporated, as a beach attraction. As a result of the decision in *Lindsay* v. *James*, 188 Va. 646, 51 S. E. (2d) 326, which held that part of the main ballroom of appellant's place was illegally blocking a twenty-foot right of way, the appellant was faced with the necessity of having to demolish that part of its buildings which housed its main attraction.

On or about June 15, 1949, Jack Kane, president of Surf Realty Corporation, sought and secured the services of Bernard B. Spigel, a practicing architect, and laid before him the problem of removing part of the existing structure, in compliance with the court order, and erecting a structure in its place. The following day Spigel, at the request of Kane, appeared before the Circuit Court of Princess Anne county and obtained an extension of thirty days in which to remove the obstruction from the right of way. Then on Spigel's recommendation, Kane engaged D. W. Gregory who promptly began the demolition work. In the meantime, Spigel assigned L. Warren Carter, an experienced and trusted employee, to the task of drawing plans for the new construction. Spigel understood that Kane intended to erect a new building, so Carter submitted a rough estimate of the cost. This estimate was more than Kane wanted to expend at that time, hence Carter suggested and submitted approximate figures on the cost of constructing over the existing outdoor dancing area, a sliding roof which could be opened or closed as weather conditions required. Kane was pleased with the suggestion and directed him to go ahead with that idea.

The sliding roof, as designed, covered an area 120 feet long and 40 feet wide. It consisted of two parallel tracks of 18 inch I beams, 40 feet apart, which spanned the length of the dancing area. These tracks were supported overhead by a number of steel columns. The midpoint of the tracks was elevated about five feet above the height at each end so that the roof was shaped somewhat like an inverted V. At each end the tracks were connected with an elevated open-air deck, which was part of the original building. This elevated track served as the support for sliding panels which provided the cover for the dancing floor. There were eight of these panels, each 40' x 12', four on each side of the apex of the elevated track. Each panel consisted of a framework of steel covered on the underside by ten 4' x 12' pieces of marine plywood. Each was equipped with a set of small

wheels on either end which rolled in H-shaped steel members welded to the inside of the I beams. There was a separate H-shaped track for each panel, one above the other, so that when the roof was opened the four panels on each side of the apex were nested, one above the other, at each end of the structure. To close the roof the panels were pulled up to the apex of the track, thus providing cover over the dancing area. The original plans called for electrically powered mechanical operators to open and close the panels, but for reasons to be discussed more fully hereafter, the mechanical operators were never secured.

On July 6, 1949, Kane, as president of Surf Realty Corporation, executed a contract with D. W. Gregory for the construction work and about a week later two contracts were executed with Sol Mednick, trading as Globe Iron Construction Company, for the fabrication and installation of the structural steel.

Work on the alterations and new construction started according to schedule, but before long the project began to be plagued with one difficulty after another. It was either raining or too hot for the men to work, and Kane was constantly urging greater speed and changing the plans to save money, all of which served to cause delay. By the middle of August most of the construction work had been completed and the structural steel was in place, but the sliding roof did not operate satisfactorily. For one thing, the panels were moved by means of a hand-operated winch and tackle blocks, which had been installed in Carter's absence. However this proved arduous because the cables were attached improperly, force was directed unevenly, and the panels jammed in the tracks with the result that it was impracticable to undertake to open or close the roof. Furthermore, the panels leaked. On August 15, 1949, Kane addressed a letter to Spigel wherein he expressed complete dissatisfaction with the entire project and indicated his intention to bring suit to recover amounts paid on the construction and losses alleged to have been suffered. With this develop-

ment, work on the entire project came to an abrupt halt. The sliding roof structure was ultimately junked and was a total loss, except for its salvage value, and in its place a new building was erected.

Spigel, Gregory, Mednick and Standing, a materialman, filed mechanics' liens and subsequently instituted this suit to enforce their liens and collect money claimed to be due for services performed, work done, and materials furnished. To the bill Surf Realty Corporation filed its answer and cross bill denying that it owed any of the complainants and asked for a judgment for damages against Spigel and Gregory.

On March 17, 1950, the cause was referred to Thomas H. Willcox, a special commissioner, to make the usual inquiries. Hearings were commenced on April 20, 1950, but due to the difficulty in finding dates suitable to counsel, the matter was heard and continued from time to time. The final hearing was further delayed by the death of one of the attorneys representing three of the appellees. In December 1951, the special commissioner filed his report in which he upheld, with minor exceptions, the claims of the holders of the mechanics liens. This excellent report, which shows painstaking work and much thought, was confirmed *in toto* by the decree from which this appeal was awarded.

This court has often said that the report of a commissioner based upon evidence taken in his presence, while not entitled to the weight given the verdict of a jury on conflicting evidence, is entitled to great weight and should not be disturbed unless its conclusions are unsupported by the evidence. This rule has been applied even where the trial court rejected the factual findings of the commissioner. *Kramer Brothers Co.* v. *Powers,* 195 Va. 131, 77 S. E. (2d) 468; *Henderson* v. *Henderson,* 190 Va. 805, 58 S. E. (2d) 77; *Mitchell* v. *Cox,* 189 Va. 236, 52 S. E. (2d) 105. The rule applies with especial force when the findings of the commissioner have been approved by the trial court. *Rorer* v. *Taylor,* 182 Va. 49, 27 S. E. (2d) 923; *Ingram* v. *Ingram,* 130 Va. 329, 107 S. E. 653, 26 A. L. R. 1175. This subject

is fully discussed in 16 M J., Reference and Commissioners, §§ 33 & 38.

Here the commissioner not only heard and saw the witnesses and observed their demeanor on the witness stand but also saw and heard them explain the use, purpose and meaning of many demonstrative exhibits. Our duty, therefore, is to determine whether the conclusions of the commissioner, approved by the trial court, are supported by credible evidence.

In opposition to Spigel's claim appellant contends that he failed to complete the work by August 5, 1949; that his design was faulty; that he did not properly supervise the construction; that the structure as designed was unworkable, unsafe and valueless and that appellant is entitled to damages for the injury it has sustained.

■ Appellant's first contention, that Spigel orally contracted to complete the work by August 5, 1949, is denied by both Spigel and Carter. Carter testified that he promised to do all that he could to get the job done by early August, but beyond that he promised nothing. In a letter written to Kane on August 18, 1949, Spigel refers to this question as follows:

"I thought you understood that we do architectural work and that contractors do the actual field construction. It would therefore be up to the contractor to state the time required to build a project. We can guess at the length of time a job should be done, but we could not—and would not —sign a contract on the time required for some other person to complete a job."

Kane signed three contracts on behalf of the appellant in connection with the work herein involved—one with Gregory and two with Mednick—but in none of these written contracts was there any mention of a completion date. It is clear that both Spigel and Carter did everything they could have reasonably been expected to do to finish the work in time for appellant to benefit from the alterations before the close of the season on Labor Day, but nowhere in

the record does it sufficiently appear that Spigel contracted to finish the work by any particular date.

On the question of faulty design, the evidence is in sharp conflict on almost every fact pertinent to a decision in the case. Appellant's petition states that "the motors intended to constitute the motive power for moving the roof panels were not even available and what was done was not suitable for the purpose, would not work, and because it was unsafe and a hazard to patrons it rendered the ballroom unusable at any time when the wind was blowing with any substantial velocity."

There is no merit to the contention that the motors were not available. Carter testified that in order to expedite matters in accordance with Kane's insistence on speed, on accepting the job he immediately began a study of the problems involved and the drawing of plans necessary to accomplish the desired type of construction. In the meantime Gregory was at work tearing down the building that had to be removed. When the plans were completed, bids were secured from various metal fabricators and a contract was executed by Surf Realty Corporation and the low bidder, Mednick. After these necessary preliminary matters had been completed estimates were obtained for the mechanical operators which would supply the motive power for the sliding panels. Contact was made with an out-of-town company, Richard Wilcox Company, to whom Carter sent a copy of the plans and shop drawings and requested a bid. In the meantime, on or about July 23, 1949, Carter contacted N. G. Wilson, Jr., who was connected with Door Engineering Corporation and J. G. Wilson Corporation, and requested that Wilson check into the matter and report what he could offer in the way of mechanical operators. A few days later the Richard Wilcox Company submitted a bid in excess of $8,000 which was too high to even be considered. Wilson then reported that he could do the job for $3,400, which Kane refused because it was about $1,000 more than he had estimated. Carter again contacted Wilson

and the latter submitted a new offer of $2,800 based on a revised design prepared on August 8, 1949. During this time the steel work was being erected, the panels were being installed and the roof operated by a hand propelled winch so the panels could be pulled out and the plywood bolted to the steel framework. Kane indicated that he was willing to go ahead with the $2,800 expenditure for the operators, but Wilson had some difficulty in immediately locating an electric motor which would be suitable for use with them. However, after a motor was located, Kane told Carter to forget the matter of the mechanical operators, since it was late in the season and the panels could be handled with hand winches until after the season was over. Carter agreed to try to operate the panels by hand winches and notified Wilson to cancel the order for the mechanical operators.

Wilson's testimony largely corroborates that of Carter. In this connection Wilson was questioned as follows:

"Q. Were you authorized by Mr. Carter to proceed to provide the operator on either one of those principles at either one of those figures?

"A. Inferentially, yes, because he called me up and said they wanted to go ahead with the operator, that they had some. [dance] band coming in a few days. He asked me to try to find where they could get operators, and I got in touch with the General Electric Company and they located some in Brownsville, Texas. I called Mr. Carter and told him that and he told me to get them flown in here by air express. About that time Mr. Carter, I am sure, called me on the phone from Virginia Beach and put Mr. Kane on the telephone. Mr. Kane wanted to know where those operators were, and I am sure I told Mr. Kane that we didn't have an order for the operators, and Mr. Kane told me that we did, and I told Mr. Kane that my negotiations were with Mr. Carter, and he said I had an order and contract and he was looking for me to furnish those operators."

The evidence refutes the appellant's contention that the mechanical operators were not available. This apparatus,

as Kane well knew, could not be provided immediately. Wilson estimated that it would have been the middle of August, 1949, before the operators could have been delivered, and it is difficult to see how this delay could be charged to Spigel or defeat his claim for payment due for services rendered.

The appellant's principal evidence on the question of faulty design and suitability of the structure for the purpose for which it was intended was elicited from John B. McGaughy, a consulting engineer. Kane employed McGaughy around the first of November, 1949, to examine into the sufficiency of the plans for the sliding roof which Spigel's office had prepared. McGaughy secured a copy of the architect's drawings from Spigel and the shop drawings from Mednick, made an extensive examination of the drawings and inspected the structure sometime in November of 1949. McGaughy testified that the elevated tracks (the 18″ I beams which supported the sliding panels) lacked rigidity. While the beams were securely anchored at the ends, they were not adequately braced near the 120′ span; that is to say, except at the ends there were no connections or braces of any kind between the east and west track, with the result that the slightest movement of either track caused it to be out of line with the other track and this in turn caused the sliding panels to bind and made it almost impossible to move them. McGaughy also testified at great length regarding the strength and carrying capacity of the structural members, which is referred to by engineers and architects as the "section modulus". He detailed the deficiency as to each column, indicating where in his opinion the developed stress exceeded the allowable stress and stated that when he examined the structure about two thirds of the columns were out of plumb. McGaughy was asked the following question by the commissioner:

"Q. What did the plans show they [referring to two of the columns that were then being discussed] were to be braced to?

"A. There was a change between the architect's plans and the shop drawings as submitted by the Globe Iron. The architect's plans don't show those column braces. They had a channel in each running from column to column which had been apparently removed from the structure as originally designed."

The architect's assistant, Carter, also referred to this change in the plans. The channels which McGaughy referred to were actually fabricated and delivered to the job, but Kane objected to them because he thought they were unsightly and would obstruct the view of the band stand from some of the tables, so Carter undertook to fasten some braces to the old wooden structure.

It was McGaughy's opinion, disputed by Sol and M. L. Mednick, licensed civil engineers, and Spigel and Carter, that the design was not in accordance with good structural engineering practice, and that the structure was not safe and would endanger human life.

Sol Mednick, whose company had fabricated and installed the structural steel, testified that he had been in the business of fabricating and installing steel for twenty-seven years. He challenged McGaughy's computations of both the required and actual section modulus of the channel track and stated that McGaughy had neglected to take into consideration that the H beams were welded to the channel track which added strength to the I beams, and resulted in a greater section modulus. Mednick further stated that the sliding panels provided additional lateral support and considering this fact along with the fact that the I beams were strengthened by the addition thereto of the H beams, Mednick computed a required section modulus of the channel of about one fourth of that which McGaughy said was required.

There is another factor which enters into the computation of the section modulus and tends to compound the confusion surrounding the several computations. The original plans did not call for an awning and none was con-

templated when the structure was designed and installed. But a very large awning, estimated to be from 10 to 15 feet wide and about 92 feet long, was hung from the east channel track to protect the ocean side of the dance floor, which was open to the elements. Obviously, if this large awning were hung from the channel vertical to the ground it would expose a considerable surface to wind pressure.

Mednick also discussed the columns where McGaughy found the greatest deficiency in the entire structure. Without reviewing at length all of the involved and technical testimony it is sufficient to say that in Mednick's opinion the steel columns as designed were adequate under the circumstances and well within the required section modulus. In this connection it was admitted by all the parties that an error had occurred in Mednick's shop and some of the columns which were designed to be six inches in diameter were inadvertently changed to four inches and so installed. Carter had noticed this error and intended to leave things as they were until the season ended within the month and make the change at that time when it would not interfere with the operation of the club. Mednick said that the reason his and McGaughy's computations as to the columns disagreed was because he used American Institute of Steel Construction formula No. 23, while McGaughy used formula No. 22. See, Steel Construction Manual of the American Institute of Steel Construction, (5th ed. 1946) page 373. In this connection Mednick testified as follows:

" * * * These columns we have here are cantilever columns and the entire pressure is applied towards the top. You don't have it bound at the bottom. The column here (indicating) is used in the same way a beam is used. Formula 22 assumes that the columns are free at the top like a flagpole would be, but they are not. They are guided columns, and are connected by the track panels, therefore, the section modulus which is dependent upon the moment in the column is half of what it would be if they used it as a free column under formula 22."

When Carter learned of the difficulty caused by the binding of the sliding panels he secured additional rollers which he planned to weld to the ends of the sliding panels. He testified, and other witnesses agreed, that these rollers plus a change in the connections for the cables leading to the winches would eliminate the trouble. However, because the work was stopped none of these changes was actually made. Yet even after his services had been terminated, Carter urged Kane to install the rollers and make the changes in the connections.

Carter in his testimony discussed the leaking roof and explained that while it was under construction there were torrential rains making it impossible to effectively caulk the many seams of the plywood, and in addition, the workmen walked on the panels causing the seams to open. Another source of trouble was the holes which had been drilled in the steel framework and through which the water leaked profusely. When work ceased the caulking and hole stopping had not been entirely completed, but would have been finished except for the action of the owner.

The appellant earnestly argues that it has suffered great loss as a result of the defects in the roof and that these were due to the failure of the architect, appellee Spigel, to execute proper and sufficient plans and specifications to produce a structure suitable for the purpose for which it was constructed and to his failure properly to supervise the construction. This brings us to a discussion of the law controlling the duties and responsibilities of an architect.

An architect, in the preparation of plans and drawings, owes to his employer the duty to exercise his skill and ability, his judgment and taste reasonably and without neglect. *Simpson Bros. Corp.* v. *Merrimac Chemical Co.*, 248 Mass. 346, 142 N. E. 922; *Trunk and Gordon* v. *Clark*, 163 Iowa 620, 145 N. W. 277.

In his contract of employment he implies that he possesses the necessary competency and ability, to enable him to furnish plans and specifications prepared with a reasonable

degree of technical skill. He must possess and exercise the care of those ordinarily skilled in the business and, in the absence of a special agreement, he is not liable for fault in construction resulting from defects in the plans because he does not imply or guarantee a perfect plan or a satisfactory result. *White* v. *Pallay*, 119 Or. 97, 247 P. 316; *Chapel* v. *Clark*, 117 Mich. 638, 76 N. W. 62. See the annotation to *Hill* v. *Polar Pantries*, 219 S. C. 263, 64 S. E. (2d) 885, 25 A. L. R. (2d) 1080 (1951), for a comprehensive discussion of when and under what circumstances an architect is responsible for defects or insufficiency of work attributable to his plans, and for lack of proper supervision over such work.

No special agreement having been made by Spigel with Surf Realty Corporation, the undertaking did not imply or guarantee a perfect plan or satisfactory result, but did require that Spigel and his agents use reasonable care and diligence in the preparation of plans and in the supervision of the work. There was credible evidence that justified the commissioner in finding that Spigel used reasonable care and diligence in the preparation of the plans. Our study of the appellant's evidence fails to disclose that the architect's design was faulty, or that the structure was unworkable, unsafe and valueless. However, the evidence supports the finding of the commissioner that Spigel was negligent in not discovering the error that Mednick made in substituting four inch columns for six inch columns and certain faults in some roof work done under Gregory's supervision. For this Spigel was properly held responsible.

At this point it might be helpful to note by way of review that there was evidence before the commissioner that Kane made the initial decision to use a retractable roof; thereafter made changes for aesthetic reasons in the original design such as doing away with some of the steel braces; decided to save money by eliminating the mechanical operators and substituting hand-operated winches; installed an awning not called for in the design, the effect of which was to pull the east track and columns out of line, and

finally, called a halt to all work so that it was impossible to determine whether the contemplated steps, such as Carter's plan to try out new rollers and cables, would have corrected all the defects. Each of the above actions by Kane played an undetermined role in the faulty operation of the roof.

The next phase of the case deals with the claim of Gregory. Surf Realty Corporation and Gregory executed a written contract on July 6, 1949, which incorporated by reference certain drawings and specifications, and under it Gregory was to receive a fixed fee of $2,200 for supervising the construction work. Appellant contends that the contract required Gregory to supervise the entire project, including Mednick's metal work, while Gregory denies that he undertook anything in connection with the steel construction. An examination of the contract discloses that there is no mention of the steel construction, and furthermore, it will be recalled that appellant executed two contracts with Mednick's company which included all the steel construction. Therefore, it is clear that Gregory's contract did not include the steel work nor did Gregory take any part in that phase of the construction. However, the trial court did reduce Gregory's claim by $759.09 on account of defective work on the roof of the old building. This part of the work was done under Gregory's supervision and he was properly charged for the deficiency.

The appellant also urges that Gregory was not a licensed and registered contractor as required by Chapter 7, Title 54 of the Code of 1950 (§§ 54-113 to 54-145) and is, therefore, not entitled to enforce his claim.

We held in *Bowen Elec. Co.* v. *Foley*, 194 Va. 92, 72 S. E. (2d) 388, that a contractor who is not licensed and registered under the aforementioned statutes cannot recover the balance claimed to be due for work performed when the cost of the undertaking was more than $20,000.

The commissioner found that Gregory was not required to be licensed and registered since the cost of the under-

taking he contracted to supervise did not exceed $20,000. The evidence clearly justifies this finding, because if we deduct the cost of Mednick's contracts for the steel work, $10,873.00, from the total cost of the project, $25,186.15, the remainder is only $14,313.15.

A discussion of appellant's claim that Mednick breached his contracts and is, therefore, precluded from recovery, would be largely a repetition of what has already been said in connection with Spigel's claim. With the exception of the error which resulted in the substitution of the four inch columns in place of six inch columns as called for in the plans, there is no evidence of any faulty fabrication on Mednick's part. This error would have been corrected had the work been completed and, in any event, Mednick's claim was reduced $100 on this account. As to appellant's charge of faulty erection of the steel by Mednick, we believe it is enough to say that the record clearly supports the commissioner's finding that the evidence is insufficient to show any faulty work, except in connection with the columns mentioned above.

Finally, we come to the claim of Standing. Here the appellant's defense is based on Code, § 43-7, which provides that the amount for which a subcontractor may perfect a lien shall not exceed the amount for which the owner is indebted to the general contractor, that is, Gregory. Standing testified that he contracted with Kane and not Gregory and that he rendered bills directly to the appellant. Moreover, Gregory's contract provided that the appellant would pay for all materials direct to the persons furnishing them and that no materials were to be bought or delivered in the name of Gregory without written consent. The finding of the commissioner that Standing was not a subcontractor and that he is entitled to a lien on appellant's property for the amount of his claim is supported by the evidence.

The conclusions we have reached dispose of appellant's claims for damages against Spigel and Gregory. While we

have not discussed every issue that was argued, we have carefully studied the voluminous record and the many exhibits and are of the opinion that the findings of the commissioner are supported by oral and documentary proof and fully justified the decree of the trial court which is, therefore, affirmed.

*Affirmed.*