## Richmond

### LASTING PRODUCTS COMPANY, A CORPORATION v. PAUL GENOVESE.

June 13, 1955.

Record No. 4383.

Present, All the Justices.

The opinion states the case.

*P. B. White* and *C. Dodson Morrisette*, for the plaintiff in error.

*Norris E. Halpern,* for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

The Lasting Products Company, a Maryland corporation, instituted this action to recover $2,902.90, balance due on the purchase price of paint sold and delivered in Virginia to Paul Genovese, the defendant. The court sustained defendant's motion to strike plaintiff's evidence and entered judgment on a verdict returned by the jury in obedience to the court's ruling. Plaintiff was awarded this writ of error to review that judgment.

The facts are not controverted. Plaintiff manufactures paint and paint products for sale at its plant in Baltimore. It shipped paint from its manufacturing plant and delivered the same to the defendant in Virginia to be used on two projects in Princess Anne County. Defendant in a cross-complaint admitted receiving the paint and paying $500.00 on the contract price and alleged that he refused to pay the balance because the paint was not as represented and was defective. When it appeared from the testimony introduced by plaintiff that it had not complied with the provisions of Chapter 34 of the Acts of 1950, p. 47, codified as Sections 59-61.1 through 59-61.12, and designated the Virginia Paint Law, defendant took a non-suit of his cross-claim and moved to strike plaintiff's evidence with the result above stated.

The questions presented are: (1) whether the Virginia Paint Law is unconstitutional because it creates an undue burden upon interstate commerce; and (2) if the law is constitutional, did the failure of plaintiff to comply with its provisions bar its recovery.

The purpose of the statute is declared to be "to prevent deception

in the sale of paint, paint oil and turpentine; and to require true labels and labeling for the same." Code Section 59-61.1.

Section 59-61.3 declares: "It shall be unlawful for any person to distribute, sell, or offer for sale within this State or, except with authority of the Commission, to deliver for transportation, or transport in intrastate commerce or between points within this State through any point outside this State any of the following:

"(1) Any paint which is not registered pursuant to the provisions of Sec. 59-61.6 . . .

"(2) Any paint unless it is in the registrant's or the manufacturer's unbroken immediate container and there is affixed to such container, and to the wrapper of the retail package, if there be one, a label bearing

"(a) The name and address of the manufacturer, registrant, or person for whom manufactured;

"(b) The name, brand, or trademark under which said article is sold;

"(c) The net measure or weight of the content subject; and

"(d) An ingredient statement. . . ."

Section 59-61.6 requires that "the name and address of the manufacturer whose name appears on the label, or the name and address of the person whose name appears on the label if other than a manufacturer, of every paint which is distributed, sold or offered for sale within this State, or delivered for transportation or transported in intrastate commerce or between points within this State through any point outside this State shall be registered annually with the Commissioner upon forms furnished" by him.

Section 59-61.8 makes a violation of any of the provisions of the statute a misdemeanor.

Other provisions authorize the Commissioner of Agriculture to apply to the appropriate court for an injunction to restrain any person from violating any provisions of the Act and for seizure and condemnation of paint repeatedly offered for sale without compliance with the provisions of the Act.

The states, by Article I, Section 8, Clause 3, of the Constitution of the United States, have delegated power to Congress "to regulate commerce with foreign nations and among the several states. . . ." There remains in the states no power to adopt any act regulating such commerce in conflict with congressional action, or which creates an undue burden upon interstate shipments. But this does

not exclude from the states the power to adopt regulations upon matters of local concern to protect the public health, public morals, public safety, and public convenience, provided such acts are local in their character and affect interstate commerce only incidentally, or as the late Chief Justice Stone said in *Parker* v. *Brown*, 317 U. S. 341, at 360, 63 S. Ct. 307, 87 L. ed. 315:

". . . This Court has repeatedly held that the grant of power to Congress by the Commerce Clause did not wholly withdraw from the states the authority to regulate the commerce with respect to matters of local concern, on which Congress has not spoken. . . . *A fortiori* there are many subjects and transactions of local concern not themselves interstate commerce or a part of its operations which are within the regulatory and taxing power of the states, so long as state action serves local ends and does not discriminate against the commerce, even though the exercise of those powers may materially affect it. . . ." See article by Dean Ribble, "National and State Corporation under the Commerce Clause", 37 Columbia Law Review 41.

The late Chief Justice Hughes, in the *Minnesota Rate cases*, 230 U.S. 352, 408, 33 S. Ct. 729, 48 L. R. A. (N. S.) 1151, 57 L. ed. 1511, stated that the federal Constitution gave authority to Congress to adequately secure the freedom of commercial intercourse from state control and to provide effective regulation of that intercourse as the national interest may demand, and that in the absence of congressional action there remains in the states the exercise of the power appropriate to their territorial jurisdiction in making provisions for local needs. The state may provide local improvements, create and regulate local facilities and adopt protective measures of a reasonable character in the interest of health, safety, morals and welfare of its people, although interstate commerce may incidentally or indirectly be involved. He expressly states, pp. 402 and 403:

". . . Our system of government is a practical adjustment by which the National authority as conferred by the Constitution is maintained in its full scope without unnecessary loss of local efficiency. Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the State appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained will of individuals because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the Federal power. . . ,

"State inspection laws and statutes designed to safeguard the inhabitants of a State from fraud and imposition are valid when reasonable in their requirements and not in conflict with Federal rules, although they may affect interstate commerce in their relation to articles prepared for export or by including incidentally those brought into the State and held for sale in the original imported packages. . . ."

The mere fact that the Virginia Paint Law declares that its purpose is to prevent deception and fraud does not of itself bring it within the purview of the police power. It must appear that there is some real and substantial connection between the declared purpose of the law and the actual provisions thereof and that such provisions do in some appreciable and appropriate manner tend toward the accomplishment of the object for which the power is exercised. *Real Silk Hosiery Mills* v. *City of Portland, and others*, 268 U. S. 325, 45 S. Ct. 525, 69 L. ed 982; *Brimmer* v. *Rebman*, 138 U. S. 78, 11 S. Ct. 213, 34 L. ed 862; 10 Michie's Jur., Interstate Commerce, Sec. 6, p. 634; 10 Am. Jur., Commerce, Sec. 94, p. 86.

A North Carolina statute requiring that every bag, barrel, or other package of commercial fertilizer offered for sale in the State should contain a label truly describing its chemical composition, which must comply with a certain formula, and charging 25¢ per ton to meet the cost of inspection, was upheld. *Patapsco Guano Co.* v. *North Carolina*, 171 U. S. 345, 18 S. Ct. 862, 43 L. ed. 191.

An Indiana statute forbidding the sale in original package of concentrated feeding stuff prior to the inspection or analysis for the purpose of ascertaining whether certain minimum standards as to composition had been met, and making a reasonable charge for such inspection, was likewise upheld in *Savage* v. *Jones*, 225 U. S. 501, 32 S. Ct. 715, 56 L. ed. 1182. In so holding, Chief Justice Hughes, at pp. 524 and 525 (225 U. S.), said:

"The evident purpose of the statute is to prevent fraud and imposition in the sale of food for domestic animals, a matter of great importance to the people of the State. Its requirements were directed to that end, and they were not unreasonable. It was not aimed at interstate commerce, but without discrimination sought to promote fair dealing in the described articles of food. The practice of selling feeding stuffs under general descriptions gave opportunity for abuses which the legislature of Indiana determined to correct, and to safeguard against deception it required a disclosure of the ingredients contained in the composition. . . .

". . . (W)hen the local police regulation has real relation to the suitable protection of the people of the State, and is reasonable in its requirements, it is not invalid because it may incidentally affect interstate commerce, . . ."

In *Plumley* v. *Massachusetts*, 155 U. S. 461, 15 S. Ct. 154, 39 L. ed. 223, a Massachusetts statute forbidding the sale of oleomargarine colored to look like butter and shipped from a foreign state into Massachusetts, was held valid on the ground that the object of the statute was to suppress false pretenses and to promote fair dealing in the sale of articles of food.

The Virginia Paint Law is designed to prevent all manufacturers of paint from offering their products for sale, or from giving out directions for their use, which differ in substance from those made in the certificate of registration, or from selling paint, the composition of which differs from the composition in the certificate of registration as stated on their labels. It forbids the misbranding of paint and provides penalties for violation.

The general public knows very little about paint or its ingredients; hence, in the sale of same there lies an opportunity for the perpetration of fraud. Only chemists know about paints and their genuineness. The painter or painting contractor knows how to apply paints, but he cannot by looking at a container know its quality or genuineness. Only the results prove to him the worth of it, and the chemist must analyze it to determine its quality. These are the facts which doubtless induced the General Assembly of Virginia to adopt the paint law designed to prevent fraud on the part of manufacturers of paint, in disposing of their products in this State, by requiring them in advance of sale to state their claim for the manufactured articles and the ingredients thereof.

Plaintiff contends that compliance with the Virginia Paint Law will not protect the citizens of the State from machinations of unscrupulous manufacturers of paint, and that such compliance will not prevent a party so inclined to practice the deception and fraud by inserting in his containers a product different from and inferior to that which it purports to be. This may be, but failure to comply therewith renders the article subject to seizure and condemnation and makes the violator guilty of a crime. There are laws against murder, robbery and theft. Such laws do not prevent crimes of this nature from being committed, but they do provide punishment for the violators that is intended to and does serve as a deterrent.

The Virginia Paint Law goes further than merely providing

punishment for its violation. The Commissioner of Agriculture is authorized to obtain a temporary or permanent injunction restraining any person from violating any of the provisions of the law. The Commissioner can issue and enforce a stop-sale or removal order. He is authorized to institute proper proceedings in a court of competent jurisdiction for seizure and condemnation of any paint being sold or offered for sale in violation of the law.

■ Plaintiff contends that the Act is discriminatory and is not applicable to all persons selling paint in Virginia; and that it is not applicable to plaintiff.

This contention is based upon its misconception of the provisions of Code Sec. 59-61.9. This section in substance declares that the penalties for violation of the Virginia paint statutes shall not apply to any person who shall sell paint through an agreement with any manufacturer, industrial agent, or agent of the Federal government or State of Virginia or a subdivision thereof, or public service corporations, for "direct use", provided the evidence concerning such sale is furnished to the Commissioner upon request, and providing further that none of the parties declared to be exempt intends to expose for sale, or sell the same to the general public.

Plaintiff admits that it sold and offered for sale to the defendant in Virginia, through H. H. Harris, its resident agent, the paint which is the subject of this action. Harris resided in Norfolk and was the representative of plaintiff for the eastern Virginia and Carolina territory. He testified that he offered for sale and made the sale to defendant in Princess Anne County for use in painting houses in the county. From the foregoing evidence it is obvious that the defendant is not within the class of persons declared to be exempt from the application of the statute; indeed, defendant purchased the paint for use on dwellings contemplated to be sold to the general public, whose interest the act was intended to protect.

We find nothing discriminatory in the provisions of the Virginia Paint Law. They apply to residents and non-residents alike. They do not disclose any economic motives tending to favor intrastate as against interstate commerce. They were not designed to obstruct the even flow of interstate commerce and only incidentally affect it. The adoption of the statutes is a reasonable exercise of the police power of the State to prevent fraud and imposition in the sale of paints to the general public.

■ Plaintiff's final contention is that its violation of the provisions of the Virginia Paint Law does not bar its right to recover

the balance due on its contract of sale with the defendant.

The statute, 59-61.3, makes it unlawful for any person to distribute, sell, or offer for sale within this State any paint not registered with the Commissioner of Agriculture, and unless there is attached to each container a label showing the name and address of the manufacturer or registrant, the brand, name, or trademark, the net measure or weight, and the ingredients. Failure to comply with either requirement is declared to be a misdemeanor. Sec. 59-61.8. The general rule is that a contract made in violation of a statute enacted to protect the public against fraud, imposition, or to safeguard the public health, or morals, is illegal and unenforceable by the guilty party. Additional discussion of this question would be mere repetition of what this Court has said in the following cases: *Cohen* v. *Mayflower Corp.*, 196 Va. 1153, 86 S. E. (2d) 860; *Rohanna* v. *Vazzana*, 196 Va. 549, 84 S. E. (2d) 440; *Surf Realty Corp.* v. *Standing*, 195 Va. 431, 78 S. E. (2d) 901; *Bowen Electric Co., Inc.* v. *Foley*, 194 Va. 92, 72 S. E. (2d) 388; *Colbert* v. *Ashland Construction Co., Inc.*, 176 Va. 500, 11 S. E. (2d) 612; *Massie and Miller* v. *Dudley*, 173 Va. 42, 3 S. E. (2d) 176.

The foregoing decisions are in accord with what Mr. Justice Harlan said in *Continental Wall Paper Co.* v. *Voight & Sons Co.*, 212 U. S. 227, at p. 262, 29 S. Ct. 280, 53 L. ed. 486:

". . . We hold that such judgment cannot be granted without departing from the statutory rule, long established in the jurisprudence of both this country and England, that a court will not lend its aid, in anyway, to a party seeking to realize the fruits of an agreement that appears to be tainted with illegality, although the result of applying that rule may sometimes be to shield one who has got something for which as between man and man he ought, perhaps, to pay, but for which he is unwilling to pay.

"In such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties. . . ."

For the reasons stated the judgment of the trial court is affirmed.

*Affirmed.*