## CITY OF EVELETH AND ANOTHER v. EARL RUBLE AND OTHERS.

225 N. W. 2d 521.

December 6, 1974—No. 44336.

250

*Hammer, Halverson, Watters & Bye, Gene W. Halverson, Anthony S. Downs,* and *Robert C. Maki,* for appellants.

*Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Hyman Edelman, David Karan, Morris H. Greenberg,* and *Ben P. Constantine,* for respondents.

Heard before Sheran, C. J., and Otis and Todd, JJ., and considered and decided by the court en banc.

SHERAN, CHIEF JUSTICE.

Appeal from an order of the St. Louis County District Court denying the motion of defendants-appellants for amended findings and conclusions or a new trial and from the judgment then entered.

Plaintiffs-respondents, the City of Eveleth and the Public Utilities Corporation of Eveleth (hereinafter called the City), sued to recover damages from defendants-appellants, Earl Ruble, Jerome Miller, Earl H. Ruble & Associates, and Ruble and Kaple, Inc. (hereinafter called the Engineer), for alleged negligence and breach of contract in the design of a new water treatment plant.[1] The significant issue raised by the appeal is whether the

---

[1] Also defending below were the general contractor, Tini Plumbing & Heating Company, and its surety, St. Paul Fire and Marine Insurance Company. A third-party action by Tini against Harvey Construction Company, a subcontractor, and its surety, Security Insurance Group, was settled during trial, as was plaintiffs' claim against Tini and its surety.

evidence justifies so much of the award in plaintiffs' favor as is based on (a) an allowance of damages in the amount of approximately $23,500 for failure to design an intake system adequate to meet the anticipated requirements of the City, and (b) an allowance of damages in the amount of $9,500 for failure to specify and provide for pumping equipment designed in such a way as to eliminate destructive pressures in the distribution lines of the City's water system.

The factual background begins in 1962 when the City, persuaded that its system of diverting water from St. Mary's Lake for treatment, storage, and use was inadequate for current and anticipated needs, retained the Engineer to furnish an engineering report and preliminary plans for a water treatment facility to replace the one then in operation. By the terms of the agreement, the Engineer was obligated to prepare and complete plans and specifications, estimates of cost, and the contract documents. It agreed "to assist the owner in obtaining compliance with the contract documents" but did not "guarantee the performance of the contract by the contractor." It was to afford what is termed "resident construction observation."

The specifications were prepared. Bids were let. On May 12, 1964, the construction contract for the planned facility was executed. On April 29, 1968, the plant became operational.

After operation of the new facility commenced, performance was found to be unsatisfactory in a number of respects, including these two: (1) The intake capacity of the water treatment plant proved to be inadequate; (2) pressures in the cast-iron distribution lines leading from the water treatment plant to users and to storage facilities apparently caused some of the leaded joints in the line to give way. The allowances for damages made by the trial court because of these deficiencies require a statement of the principles of law which apply in an action such as this one against a professional engineer for errors and omissions and an

assessment of the evidence presented at trial considered in light of these principles.

## THE LEGAL PRINCIPLES

These legal principles are applicable to the issues to be considered:

(1)  One who undertakes to render professional services is under a duty to the person for whom the service is to be performed to exercise such care, skill, and diligence as men in that profession ordinarily exercise under like circumstances.[2]

---

[2] Cowles v. City of Minneapolis, 128 Minn. 452, 151 N. W. 184 (1915). See, Note, 58 Iowa L. Rev. 1221; Note, 19 Cleveland State L. Rev. 184; Note, 55 Calif. L. Rev. 1361; Hoeveler, *Architects', Engineers' and Insurance Agents' Professional Liability,* 516 Ins. L. J. 746 (1966); Witherspoon, *Comments on Liability of Architects and Engineers,* 36 N. D. L. Rev. 34; Bell, *Professional Negligence of Architects and Engineers,* 12 Vanderbilt L. Rev. 711; Restatement 2d, Torts, § 299A.

We are aided in consideration of the questions presented by the volume of cases concerned with professional liability in other areas of expertise. Gammel v. Ernst & Ernst, 245 Minn. 249, 72 N. W. 2d 364 (1955). See, e.g., Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc. 392 F. 2d 472 (8 Cir. 1968); Peerless Insurance Co. v. Cerny & Associates, Inc. 199 F. Supp. 951 (D. Minn. 1961); Bodin v. Gill, 216 Ga. 467, 117 S. E. 2d 325 (1960); Guilan, *Liability of Architects and Engineers,* 35 Tenn. L. Rev. 9 (1967).

For discussions of professional negligence in other fields, see, e.g., Gammel v. Ernst & Ernst, *supra* (accountants); Harris v. Wood, 214 Minn. 492, 8 N. W. 2d 818 (1943) (dentist); Swanson v. Chatterton, 281 Minn. 129, 160 N. W. 2d 662 (1968); Schulz v. Feigal, 273 Minn. 470, 142 N. W. 2d 84 (1966); Jensen v. Linner, 260 Minn. 22, 108 N. W. 2d 705 (1961); Manion v. Tweedy, 257 Minn. 59, 100 N. W. 2d 124 (1959); Yates v. Gamble, 198 Minn. 7, 268 N. W. 670 (1936); Quickstad v. Tavenner, 196 Minn. 125, 264 N. W. 436 (1936); Getchell v. Hill, 21 Minn. 464 (1875) (medical doctors).

Of particular assistance are cases involving architects. See, e.g., Kostohyrz v. McGuire, 298 Minn. 513, 212 N. W. 2d 850 (1973); Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc. *supra;* Miller v. DeWitt, 59 Ill. App. 2d 38, 208 N. E. 2d 249 (1965), affirmed in relevant part, 37 Ill. 2d 273, 226 N. E. 2d 630 (1967); Pittman Constr. Co. v. City of New

(2)   The circumstances to be considered in determining the standard of care, skill, and diligence to be required in this case include the terms of the employment agreement, the nature of the problem which the supplier of the service represented himself as being competent to solve, and the effect reasonably to be anticipated from the proposed remedies upon the balance of the system.[3]

(3)   Ordinarily, a determination that the care, skill, and diligence exercised by a professional engaged in furnishing skilled services for compensation was less than that normally possessed and exercised by members of that profession in good standing and that the damage sustained resulted from the

Orleans, 178 So. 2d 312 (La. App. 1965); Covil v. Roberts & Co. Associates, 112 Ga. App. 163, 144 S. E. 2d 450 (1965); Peerless Insurance Co. v. Cerny & Associates, Inc. *supra;* Bodin v. Gill, *supra;* Scott v. Potomac Ins. Co. of Dist. of Columbia, 217 Ore. 323, 341 P. 2d 1083 (1959); Wills v. Black and West, Architects, 344 P. 2d 581 (Okla. 1959); Smith v. Goff, 325 P. 2d 1061 (Okla. 1958); Ressler v. Nielsen, 76 N. W. 2d 157 (N. D. 1956); State v. Malvaney, 221 Miss. 190, 72 So. 2d 424, 43 A. L. R. 2d 1212 (1954); Paxton v. County of Alameda, 119 Cal. App. 2d 393, 259 P. 2d 934 (1953); Surf Realty Corp. v. Standing, 195 Va. 431, 78 S. E. 2d 901 (1953); Bayshore Development Co. v. Bonfoey, 75 Fla. 455, 78 So. 507 (1918); Dysart-Cook Mule Co. v. Reed & Heckenlively, 114 Mo. App. 296, 89 S. W. 591 (1905); Chapel v. Clark, 117 Mich. 638, 76 N. W. 62 (1898); Coombs v. Beede, 89 Maine 187, 36 A. 104 (1896). See, also, Annotation, 25 A. L. R. 2d 1085; 5 Am. Jur. 2d, Architects, § 8.

[3] See cases cited in footnote 2. In addition, see Kostohyrz v. McGuire, *supra,* where we said (298 Minn. 517, 212 N. W. 2d 854): "The duty and liability of an architect, whether sounding in tort or arising out of a breach of contract, is measured as stated in Gammel [*supra*] * * *." The duty and liability stated in Gammel are no different from what we have said. Gammel was *ex delicto,* not *ex contractu.*

See, also, Northern Petrochemical Co. v. Thorsen & Thorshov, Inc. 297 Minn. 118, 211 N. W. 2d 159 (1973); 58 Iowa L. Rev. 1221, *supra;* 55 Calif. L. Rev. 1361, *supra;* 12 Vanderbilt L. Rev. 711, *supra;* Restatement 2d, Torts, § 299A. But see, City of East Grand Forks v. Steele, 121 Minn. 296, 141 N. W. 181, 45 L. R. A. (N. S.) 205 (1913). Cf. Note, 58 Minn. L. Rev. 773 (1974), where some doubt is expressed about the basis of our decision in Kostohyrz v. McGuire, *supra.*

variance requires expert testimony to establish the prevailing standard and the consequences of departure from it in the case under consideration.[4]

(4)   There are some situations in which a trier of fact may, without the aid of expert testimony, find damages to have been caused by the failure of a professional to exercise reasonable care, skill, and diligence. If the solution proposed by the professional is one which the professional would not have proposed had he been fully informed as to the facts of the problem with which he was dealing, and if it is clear that the failure of the professional to ascertain the facts before recommending a solution to the problem was an omission inconsistent with the professional obligation assumed, a finding of negligence may be made without the benefit of precise scientific opinion testimony. If it is clear without resort to expert opinion that this error or omission on the part of the professional resulted in damage, and if the causation can be established, and if the damage can be measured by

---

[4] Davis v. Virginian Ry. Co. 361 U. S. 354, 80 S. Ct. 387, 4 L. ed. 2d 366 (1960); Hestbeck v. Hennepin County, 297 Minn. 419, 212 N. W. 2d 361 (1973); Silver v. Redleaf, 292 Minn. 463, 194 N. W. 2d 271 (1972); Swanson v. Chatterton, *supra*; Schulz v. Feigal, *supra*; Hoffman v. Naslund, 274 Minn. 521, 144 N. W. 2d 580 (1966); Miller v. Raaen, 273 Minn. 109, 139 N. W. 2d 877 (1966); Jensen v. Linner, *supra*; Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N. W. 2d 426 (1945); Quickstad v. Tavenner, *supra*; Johnson v. Arndt, 186 Minn. 253, 243 N. W. 67 (1932); Heffter v. Northern States Power Co. 173 Minn. 215, 217 N. W. 102 (1927); Berkholz v. Benepe, 153 Minn. 335, 190 N. W. 800 (1922); Harju v. Allen, 146 Minn. 23, 177 N. W. 1015 (1920); Getchell v. Hill, *supra*; Dinnerstein v. U. S. 486 F. 2d 34 (2 Cir. 1973); Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc. *supra*; Wills v. Black and West, Architects, *supra*; Surf Realty Co. v. Standing, *supra*; Ressler v. Nielsen, *supra*; Rice v. Tissaw, 57 Ariz. 230, 112 P. 2d 866 (1941); Norkett v. Martin, 63 Colo. 220, 165 P. 256 (1917); McGraw v. Kerr, 23 Colo. App. 163, 128 P. 870 (1912). See, also, Annotation, 53 A. L. R. 2d 142; Klein, *Making the Most of Your Expert*, 46 Conn. Bar J. 483; Allen, *Liabilities of Architects and Engineers to Third Parties*, 22 Ark. L. Rev. 454. Note, also, Lorenz v. Lerche, 157 Minn. 437, 196 N. W. 564 (1923).

persons of ordinary learning and understanding, the opinions of experts are not needed.[5]

In the case before us, except for broad generalizations of the obvious, there is an absence of the definitive expert testimony required by the general rule. The responsibilities of the trier of fact would have been less burdensome if the findings of negligence made in this case had been based upon expert opinion. But since we do not find it in the record, we deal with the question of whether the findings of negligently caused damages can be sustained without it, the standards for review being as stated in In re Estate of Balafas, 293 Minn. 94, 198 N. W. 2d 260 (1972).[6]

## I. INTAKE CAPACITY

We believe that the trial court was justified in finding, without the aid of expert testimony, that the Engineer's errors and omissions constituted negligence and resulted in an inadequate intake capacity, to the City's damage in the amount of approximately $23,500.

By the terms of the October 1962 agreement between the Engineer and the City, the Engineer was obligated to *analyze the piping, valving, and structural characteristics of the existing plant* so as to establish desirable changes to provide effective sanitary and economic operation and to determine a more suit-

---

[5] See, e.g., Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc. *supra*; Kostohyrz v. McGuire, *supra*; Hestbeck v. Hennepin County, *supra*; Swanson v. Chatterton, *supra*; Schulz v. Feigal, *supra*; Miller v. Raaen, *supra*; Jensen v. Linner, *supra*; Ellering v. Gross, 189 Minn. 68, 248 N. W. 330 (1933); Johnson v. Arndt, *supra*; Getchell v. Hill, *supra*; 65 A. L. R. 1023; 141 A. L. R. 5; 162 A. L. R. 1265; Prosser, Torts (4 ed.) §§ 32, 39; 7 Dunnell, Dig. (3 ed.) §§ 3325, 3332, 3333. Cf. Silver v. Redleaf, *supra*; Fowler v. Scheldrup, 166 Minn. 164, 207 N. W. 177 (1926); Footnote 3, *supra*. Cf. Restatement 2d, Torts, § 300.

[6] In that case we distinguished the scope of review used when an action is tried to the court rather than to the jury. Rule 52.01, Rules of Civil Procedure for the District Courts, governs. We will not set aside a finding of fact unless it is clearly erroneous.

able means for increasing water plant output of properly treated water. The Engineer knew, or had reason to know, that the City was motivated to expend substantial sums for a new water plant in order to increase the intake capacity of the works to a level of approximately 2,500 gallons per minute. Being aware of the City's expectations as to the intake capacity of the new plant, the Engineer recommended that the then existing system, whereby the City's water supply was diverted from St. Mary's Lake by means of suction applied to a pipe extending into the lake, be replaced by a "gravity system." [7] Lake water was to be moved into a well-like structure located near the shoreline, called a "shorewell." [8] Of signal importance, the line of pipe to be used for this purpose was to be the same one used as part of the replaced suction system. From the shorewell the water was to be pumped by "low-lift service pumps" to a newly constructed water treatment plant from which, after sanitation, it was to be pumped by "high-lift service pumps" into the City's transmission lines and a storage reservoir. The evidence supports the trial court's conclusion that the intake capacity of the new plant proved inadequate,[9] in part because there was a failure to anticipate changes in the lake level and the effect thereof upon the flow of water to the water treatment plant, and in part because the existing intake line incorporated into the gravity system was not 18 inches in diameter throughout its length, as was assumed, but instead was in some places 16 inches and in others only 12 inches in diameter. In the absence of evidence demonstrating that the changes in the lake level were such as could not reasonably

---

[7] A gravity system operates on a "gravity feed" principle. Water is to flow freely, without the aid of outside force, compelled only by the operation of gravity.

[8] A shorewell operates as would a sump. Here, lake water was intended to flow through the intake pipe and down into the sump or depression that is the shorewell.

[9] The Engineer concedes that the shorewell does not receive sufficient quantities of water at all times and that this failure is due to the fact that the intake pipe was not of the dimensions it was thought to be.

have been anticipated by an engineer recommending the use of a gravity system, the effectiveness of which depends on such levels, the failure of the Engineer to design this intake facility in such a way as to make functional accommodation to changes in lake levels possible was not consistent with the level of skill, care, and diligence to be expected of a design engineer. Should the trier of fact have difficulty in drawing this inference without the aid of expert testimony, the preparation of designs based upon the assumption that the intake line was 18 inches in diameter when in fact it was significantly less than that would support, if not compel, a finding of negligence, in the absence of some acceptable explanation for the failure to ascertain the true dimensions of this pipe.

The explanation, if there is one, appearing in the record suggests that the Engineer may have been misled into believing that the intake line was 18 inches in diameter by a picture and some incomplete drawings that were made available to him and the circumstance that physical measurement of the intake line was made difficult by the presence of sediment which had built up around it in the bottom of the lake.

We believe that the trial judge was able to assess the validity of these excuses without the aid of expert testimony. The evidence demonstrates that the intake pipe, located in the lake, which served the old suction system and which was employed as a part of the new gravity system was approximately 200 feet in length. It was laid on the bottom of St. Mary's Lake in approximately 40 feet of water. Two vertical pipes, known as risers, projected upwards from it a distance of about 18 feet. The Engineer testified that all the information and drawings obtained from the City and from state authorities indicated that the intake pipeline was 18 inches in diameter. A photograph of the intake pipe as it lay on the ice of St. Mary's Lake prior to original installation was examined, but no claim is made that the precise diameter of the pipeline could be determined from looking at this picture. The Engineer's employees entered the lake for the purpose of examin-

ing the intake line but failed to note the reduction in its size to 16 inches and again to 12 inches, perhaps because of the presence of sediment covering the pipe as it lay on the bottom of the lake. Whatever difficulty may have been experienced in deciphering the available drawings containing information relevant to the size of the intake pipe, the evidence is uncontradicted that in September 1966, at a time, perhaps, too late to effect design alterations, a professional diver found it possible to ascertain the true dimensions of the piping, i.e. 12-inch risers leading into a 12-inch "L," leading into a 12-inch "T," leading into a 12-inch stub, leading into a 16-inch horizontal pipe heading toward the shoreline and the plant. A blueprint which had allegedly been available to appellants, but which was not examined by them, showed an intake structure similar to that disclosed by the 1966 physical examination. In our judgment, no expert opinion is needed to demonstrate that a design engineer charged with the responsibility of analyzing the piping and other structural characteristics of an existing plant should be as certain of the dimensions of the intake line as circumstances would possibly permit before recommending a plan the function of which depended upon this critical measurement. It would seem clear that the examination of a photograph of the line would be of little value. Incomplete drawings made available to the Engineer at its request indicate that the intake line was 18 inches in diameter at the point of terminus with the old plant, but we believe that common knowledge would reject this as adequate basis for careful analysis. We find the explanation given for the failure of the Engineer's employees who entered the lake for the purpose of measuring the intake line unsatisfactory when the record shows that others employed for this same purpose by the City were able to obtain the true dimensions of the intake line without difficulties disproportionate to the importance of the task.

It seems to us that when a professional designs a water plant, in particular a plant intended to deal with increased community needs, that professional should, as a matter of reasonable care,

be certain of the size of the piping which provides the plant with raw water and should be equally certain that, ultimately, there will be an adequate supply of water, both in the sense of supply to the plant and in the sense of supply upon which the plant may draw, to meet the operational expectations of the design; or, in avoidance, should more convincingly demonstrate why, under the circumstances, it was good professional practice not to do so.

To our way of thinking, appellants failed to take the steps necessary to obtain that assurance, given the physical availability of the information in the piping itself and appellants' difficulties in obtaining other conclusive data, at a time which would allow the owners to re-evaluate their commitment prior to the physical construction's actual beginnings. Furthermore, they failed to design a total intake system that would ensure the plant an adequate shorewell supply of water. We believe that appellants' omissions were so apparent that it was within the ability and province of the trier of fact, one without pertinent professional skills using only his common sense, experience, knowledge, and comprehension, to conclude that the conduct was negligent under the circumstances, this without aid of expert testimony on the standard of care or its breach.

The trial court found:

"To remedy the present situation of the intake carrying capacity, and to insure an intake capacity of 2500 gallons per minute at the minimum lake level, to which plaintiffs are entitled, a proposed modification as represented by Exhibit 26 would be of the reasonable cost of $17,452.00, plus contractor overhead and profit (20%) in the amount of $3,490.40, and engineering and inspection (15%) in the amount of $2,617.80, for a total of $23,560.20."

The memorandum made part of the order for judgment reads, in part:

"The measure of damages in a case against an engineer appears to be patterned after the rule set down in H. P. Droher and

Sons v. Toushin, 250 Minn. 490, 85 N. W. 2d 273. * * * [W]here there has been a substantial good faith effort to perform the contract but there are defects of such a nature that the contract has not been performed according to its terms which defects can be remedied without the destruction of a substantial part of the building, the owner is entitled to recover the cost of making the work conform to the contract."

In Northern Petrochemical Co. v. Thorsen & Thorshov, Inc. 297 Minn. 118, 211 N. W. 2d 159 (1973), an action against an architect, a general contractor, and a structural engineer for damages resulting from the alleged faulty construction and subsequent reconstruction of a building, and a cause founded in claims of negligence, breach of contract, and breach of warranty, we held:

"* * * The preferred measure of damage in a case such as this is to take either the cost of reconstruction in accordance with the contract, if this is possible without unreasonable economic waste, or the difference in the value of the building as contracted for and the value as actually built, if reconstruction would constitute unreasonable waste. [Citing H. P. Droher & Sons v. Toushin, 250 Minn. 490, 85 N. W. 2d 273 (1957).]" 297 Minn. 124, 211 N. W. 2d 165.

In Annotation, 25 A. L. R. 2d 1085, 1100, the following is said with respect to the measure of damages for an architect's liability:

"The trend of the decisions generally seems to make the measure of damages recoverable against an architect for defects attributable to plans or specifications depend largely upon the character and extent of the shortcoming. Where it can be corrected without unreasonable or disproportionate expense, such expense is ordinarily the measure of the damages recoverable. If, however, the defect is so basic or extensive that it cannot be remedied at reasonable expense or without tearing down and rebuilding the structure, then the proper measure of damages is

the difference between the value of the building as it is and the value it would have had if the plans and specifications had been adequate.

"Where defects or insufficiency of work * * * are attributable to the architect's plans, the measure of damages applied in a majority of the cases has been the cost of remedying the defective construction."

To the same effect see 5 Am. Jur. 2d, Architects, § 24. Cf. Restatement, Contracts, § 346; McCormick, Law of Damages, § 168.

We believe the damages allowed in this case to be reasonably consistent with the authorities to which reference has been made.

## II. HIGH SERVICE PUMPS

The allowance of damages in the amount of $9,500 on account of defects in the design of the high service pumps presents more difficult problems.

The trial court found:

"The function of the three high service pumps is to distribute the clear water to the elevated storage tank for distribution to consumers. The high service pump equipment, as designed by defendants, causes sudden surges with consequent water hammer, resulting in blowing out of lead seal joints. Both defendants Ruble and Miller testified that good engineering practice and standards required that as engineers they should design the plant in such manner as not to destroy or damage the existing water transmission and distribution system. Although defendants had knowledge of the age of the existing transmission line and its leaded joints, they negligently designed the valves on the high service pumps. The installation of electric check valves, in addition to pressure relief valves, will permit a very gradual acceleration of the water column and corresponding reduction in the pump starting surge.

"The reasonable cost of installing electric check valves and pressure relief valves is the sum of $9,500.00."

We find nothing in the contract between the City and the Engi-

neer which could be construed as an express or implied commitment[10] that the City's transmission lines would be trouble-free following the installation of the new facility. The distribution lines, buried in the ground, were 3 miles in length. They had been in use for approximately 60 years. In our judgment, it would not be reasonable to expect the Engineer to guarantee the performance of these lines under these circumstances.

The liability found by the trial court was not based on breach of contract. The design of the valves and the high service pumps was found to be negligent. This finding of damage caused by negligence on the part of the Engineer implies that the Engineer was under a duty to ascertain the pressure-bearing capacity of the distribution system and that his failure to do so made the design of the safety valves defective for failure to keep the pressure exerted by the high service pumps within the pressure-bearing capacity of the lines. In our judgment, the opinions of experts qualified in the field are needed on the technical questions involved in this finding.

It is possible that the fact that the transmission lines were made up of sections of cast-iron pipe with leaded joints in use for approximately 60 years would have been sufficient to put an engineer possessed of the requisite professional skills upon notice that the line would fail unless pressure-controlling devices on the high service pumps were specified. It is possible that there are methods for testing the pressure-bearing capacity of lines laid in the ground which would have been employed by engineers of the requisite skill in the community; and that, had these testing techniques been employed, weaknesses in the line would have been discovered and the damage incurred avoided by appropriate design specifications. But what these tests might be and what they might have been expected to disclose, and whether the ex-

---

[10] On this subject generally, see, e.g., 58 Iowa L. Rev. 1221, *supra;* 19 Cleveland State L. Rev. 184, *supra;* 35 Tenn. L. Rev. 9, *supra;* 516 Ins. L. J. 746, *supra;* 36 N. Dak. L. Rev. 34, *supra;* 12 Vanderbilt L. Rev. 711, *supra.*

pense of such tests would be proportionate to the risk of failure to be apprehended—these are questions which remain unanswered in the record and, we believe, require the opinions of experts in the field.[11]

If ruptures in the line had not occurred before the reconstruction of the system and had occurred immediately and continuously thereafter, it would be reasonable to find a causal relationship between the alleged negligent design of the pumps and the damage experienced. And in the absence of some other explanation of the events so associated in time, it would be possible for the trier of fact to find the one to be the proximate cause of the other.[12] But, accepting this as established, the question remains: Would a design engineer, in the exercise of that degree of care, skill, and diligence to be expected from this profession, knowing the line pressures which would be created by the operation of the high service pumps and knowing the age of the line and the character of its construction, have reasonably anticipated that it would fail in use? If uncertain, would he have employed tests or techniques of inspection which could have been employed and which would have been employed by a design engineer applying the requisite standards of skill and care which should have revealed the deficiencies in the line? If not, would such an engineer, being unable to ascertain the facts, have recommended the installation of devices such as those now recommended as a precaution against possible but unpredictable ruptures? We do not think that common knowledge affords answers to these questions.

---

[11] Respondents direct us to instances in the record where they contend the appropriate standard of care was properly established. The alleged standards, elicited by generalized questions, merely state that it is never good engineering practice to design something that will harm or destroy existing facilities. With that no one could quarrel, but the law requires more to establish the precise duty of any person, professional or lay.

[12] See footnote 3.

It is our conclusion that the question of damages attributable to alleged defects in design of the high service pumps should be remanded to the trial court for further consideration upon the evidence which has been submitted and upon such additional expert opinion evidence as may be afforded by experts bearing specifically upon these questions: (1) Would a design engineer exercising that degree of care, skill, and diligence to be expected of like professionals under the circumstances have anticipated or measured the pressure-bearing capacity of the distribution line constituting part of the city's water system? (2) If so, would weaknesses in the line have been anticipated or discovered? And (3) if so, would a design engineer exercising the requisite degree of skill and care have specified pressure-control devices on the high service pumps of the type now recommended? If, on the basis of the expert testimony tendered, the district court is of the opinion that answers to these questions should be in the affirmative and that the standard of care was shown, by expert testimony, to have been violated, then the amount allowed in damages, under the circumstances of this particular case, is consistent with the applicable rules for damages ascertainment. If, after hearing the opinion of experts on the subject, the trial court is of the opinion that these questions cannot be answered affirmatively, the award of damages in the amount of $9,500 should be vacated.

### III.

An allowance for damages in the amount of $780 for repair of cracks in block walls in the water treatment plant also lacks supporting expert opinion testimony. Here again, if the trial court upon remand is satisfied by the opinions of competent experts that the cracks in the block walls were caused by the failure of the engineer to use the degree of care, skill, and diligence applicable in this case, the amount allowed as damages should be confirmed; otherwise, set aside.

The decision of the trial court is affirmed except as above in-

dicated, and the matter is remanded to the district court for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; and remanded to the district court for further proceedings consistent with the opinion.

MR. JUSTICE YETKA took no part in the consideration or decision of this case.