ZONTELLI & SONS, INC., Respondent,

v.

CITY OF NASHWAUK, Respondent (C1–83–1933), Appellant (C2–84–218).

Robert R. Wallace & Associates, Appellant (C1–83–1933), Respondent (C2–84–218),

and

American Fidelity Insurance Company Intervenor, Respondent.

No. C1–83–1933, C2–84–218.

Court of Appeals of Minnesota.

July 24, 1984.

Fabyanske, Svoboda & Westra, M.T. Fabyanske, Robert J. Huber, St. Paul, for Zontelli & Sons, Inc.

Hanft, Fride, O'Brien & Harries, William P. O'Brien, Paul J. Lokken, Duluth, for City of Nashwauk.

Meagher, Geer, Markham, Anderson, Adamson, Flashkamp & Brennan, O.C. Adamson, II, Laura S. Underkuffler, Minneapolis, for Robert R. Wallace and Associates.

Lang, Pauly and Gregerson, David H. Gregerson, Minneapolis, for American Fidelity Ins. Co.

Heard, considered and decided by POPOVICH, C.J., and FORSBERG and RANDALL, JJ.

## OPINION

POPOVICH, Chief Judge.

This is an appeal of the judgment, amended judgment and post trial order involving a sewer construction contract between the City of Nashwauk (City) and Zontelli & Sons, Inc. (Zontelli). Zontelli was awarded the contract as the lowest responsible bidder. The contract was a unit price contract based on plans and specifications prepared by Robert R. Wallace & Associates (Wallace) engineering firm.

Certain aspects of the actual construction of the system were substantially different than the estimates in the plans and specifications. When the parties could not agree on the appropriate compensation for the system as constructed, Zontelli commenced an action against both the City and Wallace. Zontelli's complaint recites four causes of action, two in tort and two in contract. The trial court declared the remedy provisions of the contract inadequate, unconscionable, and against public policy in its original judgment, dated September 8, 1983. The court applied comparative fault principles and apportioned fault among Zontelli, the City, and Wallace.

Wallace filed a post trial motion for amended findings of fact or a new trial. Alternatively, Wallace sought an order permitting introduction of evidence regarding the commercial reasonableness of the remedy provisions of the contract. The City neither joined in Wallace's motion nor filed its own post trial motion. The trial court denied Wallace's motion by order of November 15, 1983. The trial court did amend the judgment to give both the City of Wallace a right of contribution for any payment made to Zontelli in excess of their respective percentages of fault.

Wallace filed a notice of appeal on November 25, 1983. Zontelli followed with a notice of review on December 12, 1983. The City filed a notice of appeal on January 31, 1984. Those portions of the City's appeal not modified in the amended judgment were dismissed as untimely on March 5, 1984. Execution of our March 5 order was stayed, however, by our March 28, 1984 order.

## FACTS

As early as 1977, the City contacted Wallace concerning constructing a storm sewer system. Wallace prepared a preliminary study and cost estimate for the project.

The study was presented to and funded by the Iron Range Resources and Rehabilitation Board.

On May 2, 1978, the City and Wallace signed an agreement for Wallace's engineering services. Wallace agreed to design the project and provide sufficient plans and specifications for the project. Bruce Wallace had primary design responsibility although he was not a registered professional engineer at that time. He and a crew inspected and surveyed the project area in the fall of 1978. They visited every intersection of the project but Bruce did not recall seeing any concrete under the bituminous roadways. Wallace did not make any soil borings or conduct other subsurface testing either. A dispute exists over whether Wallace contacted the Mayor or other council members who were lifetime residents of the City. Wallace claims to have contacted street superintendent Stupar for maps of the existing sewer system and the makeup of the road surfaces. Stupar, however, testified that no one from Wallace ever asked him about either the concrete or the subsoil conditions underlying the relevant roadways. Stupar further testified he knew about the concrete underlying Highway 65 and Second Avenue and that his experience revealed a lot of muskeg in the soil.

The plans and specifications were delivered to the council for review prior to the invitation for bids. No changes were made.

On January 16, 1979, the City published a bid invitation. The invitation stated a copy of the plans and specifications could be obtained for a fee from Wallace. Dave Zontelli, President of Zontelli, obtained a copy of the bid specifications and read them. He and Frank Kingsley, a Zontelli employee, then made a visual inspection of the project area. Subsequent to this initial inspection, Kingsley took a drilling rig to the project area and took soil borings in three different locations. Two borings were made in areas where the sewer pipe was to be deeper than average. The third boring was in a low lying area of the project. All three test bores revealed clay as the subsurface soil. No inquiry of City officials nor examination of maps of the City was made, however.

Kingsley, Dave Zontelli and another Zontelli employee prepared bids independently of each other. The three bids were then compared and a final bid developed. The final bid was computed on a crew and equipment cost per day basis and included the price quotations of the subcontractors Zontelli intended to use.

The City Council opened the bids on February 5, 1979. The bids ranged from Zontelli's $335,944.00 to $503,998.30. At least part of the reason for Zontelli's low bid was the particularly favorable subcontract Zontelli had negotiated for the bituminous over concrete restoration. Two of the other seven bids submitted were also under $400,000.00. Wallace itself had estimated the construction cost at under $400,000.00. On or about August 8, 1978, Wallace estimated the construction cost at $304,500.00. Dave Zontelli testified that, at the bid letting, Wallace stated their cost estimate was $359,000. Zontelli was not sure whether this figure included Wallace's fee.

The project area included a stretch of State Highway 65. After Zontelli was awarded the contract, Wallace applied for the permit necessary for construction on state property. The permit was granted, but included time and work restrictions. The sewer work had to be completed prior to the Highway Department's planned resurfacing of the highway. Additionally, work could be done on only one intersection at a time, and work sites had to be cleaned up each night.

Zontelli had to start the sewer construction at Highway 65 because of the time limitations of the construction permit. Michael Windorski, crew foreman for Zontelli, testified he objected to starting construction at Highway 65 because it was contrary to the usual construction plan of starting at the low side and bringing the grade up. He claimed that starting at Highway 65 caused drainage back down grade which hampered construction of the down grade

area. He also blamed the difficulty in joining pipes on performing the work out of the preferred sequence.

On the third day of work, approximately June 8, 1979, Zontelli unexpectedly encountered concrete beneath the bituminous surface of Highway 65. The concrete ranged from eight to fourteen inches thick and portions were reinforced with steel bars. The plans and specifications did not indicate any concrete beneath Highway 65.

The construction contract provided that in the event of changes in the work or unexpected surface conditions, Zontelli was to provide immediate written notice to the City or Wallace respectively. While Wallace did have an inspector who was reportedly on the job daily and Bruce Wallace said he visited the construction site at least once a week, Zontelli sent no written notice of either the unexpected concrete or the unsuitable soil material until July 23, 1979.

As construction proceeded, Zontelli found concrete beneath bituminous in other unexpected areas. The bid plans indicated there was concrete under one street, including two intersections. Zontelli actually encountered concrete on two streets and ten intersections. The actual amount of concrete removed and eventually restored was 1525.55 square yards. The bid plans estimated 450 square yards of concrete removal and restoration. On August 7, 1979, as a result of the amount of unexpected concrete, Zontelli's subcontractor for bituminous over concrete withdrew his bid and refused to perform.

Zontelli also found that the granular backfill estimate in the project's specifications was substantially understated. Granular backfill is material brought in to replace soil that is unsuitable support for the sewer pipe. Zontelli's soil borings indicated the subsurface soil was clay. Clay may be suitable soil if it is dry or can be dried. Besides clay, however, Zontelli encountered muskeg on several streets, peat on three streets and several stumps, buried trees and some riprap on Highway 65. All of these materials were unsuitable soil that had to be removed and replaced with granular backfill; 1,936 cubic yards of backfill were actually required. The granular backfill estimate in the plans was 500 cubic yards. Bruce Wallace could not recall how the granular backfill estimate was arrived at.

A dispute exists over the quality and quantity of the machinery Zontelli used and its down time. This dispute extends to the number of workers on the construction crew and their deployment. There is no dispute, however, over the general quality of Zontelli's work or its timeliness.

## ISSUES

1. Whether the City's appeal was timely.

2. Whether the trial court erred by treating this case as a tort action and applying principles of comparative fault.

3. Whether the trial court erred in declaring the remedy provisions of the contract unconscionable.

4. Whether the trial court erred in concluding the City had a right of contribution against Wallace.

## ANALYSIS

1. At the outset, we are confronted with what issues are properly before us with respect to the City. Judgment from the trial court was entered on September 8, 1983. The City made no post trial motions. An amended judgment modifying only the contribution between the City and Wallace was entered on November 15, 1983 in response to alternative post trial motions of Wallace. The City's notice of appeal was filed with this court on January 31, 1984.

Rule 104.01 of the Minnesota Rules of Civil Appellate Procedure provides in part: "An appeal may be taken from a judgment within 90 days after its entry * * *." *Id.* Addressing the timeliness of an appeal from a modified judgment, our Supreme Court has said: " '[T]he time to appeal an issue begins to run anew from a modification of judgment when the issue was for some reason not appealable before the

modification.'" *Krug v. Independent School District No. 16*, 293 N.W.2d 26, 29 (Minn.1980) (*quoting E.C.I. Corp. v. G.G.C. Co.*, 306 Minn. 433, 435, 237 N.W.2d 627, 629 (1976)).

 All the issues the City raises, besides contribution from Wallace, were appealable as of the date of the original judgment's entry. The City did not file its appeal within 90 days of that judgment. We do not believe the interests of justice require a grant of discretionary review and therefore hold the City bound by the original judgment on all issues except contribution.

2. Zontelli's complaint alleges three causes of action against Wallace. First, Zontelli alleged the inaccuracy of the estimates in the specifications constituted a breach of warranty. Second, Zontelli alleged Wallace negligently prepared the contract plans and specifications. Finally, Zontelli alleged Wallace breached its engineering services contract with the City and claimed a right of recovery as an intended beneficiary of that contract. The trial court concluded the underlying nature of Zontelli's claims lay in tort and therefore applied comparative fault principles under Minn.Stat. § 604.01 (1982).

 While we can understand why the trial court wanted to apportion fault in this case, apportionment was not proper. Regardless of the fact that some of Zontelli's claims sound in tort, the basis of each claim is rooted in a contract. The claim of breach of warranty is based on the estimates included in Zontelli's contract with the City. Zontelli's claim of negligence, a tort claim, requires proof of the existence of a duty of care flowing from Wallace to Zontelli. Such a duty, if it exists at all, could only arise from the contract between Zontelli and the City or the contract between the City and Wallace. Zontelli's third party beneficiary claim is dependent on the contract between the City and Wallace.

The Minnesota Supreme Court has encountered a situation similar to our case in *Lesmeister v. Dilly*, 330 N.W.2d 95 (Minn. 1983). In a decision not given precedential value, the court affirmed the trial court's apportionment of fault, but said:

[t]he gravamen of this case in our view is contractual. Any duties between the parties arose out of contracts, about which there was opportunity to bargain and allocate risks and duties. This was not a situation in which parties were fortuitously brought together, as in an automobile accident. We conclude, therefore, that it was error to submit the theory of "negligent breach" of contract to the jury, or to allow apportionment of fault either based on the pure contract or the "negligent breach" cause of action.

*Id.* at 102. We find this statement persuasive and conclude the trial court erred in apportioning fault among the parties to this lawsuit.

3. Recognizing resolution of the foregoing issues makes determination of the unconscionability issue unnecessary, we nonetheless include a brief discussion of this important question.

 The construction contract between Zontelli and the City was a unit price contract. Certain items of work were nonpay items. The contractors had to build the cost of these items into some pay item in calculating their bid. The nonpay items were selected by either the City or Wallace. Zontelli chose which pay items would reflect the cost of the nonpay items. The City and Wallace strenuously maintain Zontelli is stuck with its choices. We would agree if the estimates in the specifications had even been reasonably accurate. Here, however, the actual requirements were more than triple the estimates and the remedies included in the contract left sole discretion regarding adjustment to the City and in no event permitted an increase in the unit prices bid. Under these circumstances, we believe "no decent, fair-minded person would view the result of its enforcement without being possessed of a profound sense of injustice." *Foursquare Properties Joint Venture I v. Johnny's Loaf & Stein, Ltd.*, 116 Wis.2d 679, 681,

343 N.W.2d 126, 127 (Wis.Ct.App.1983). The remedy provisions of the contract are therefore unconscionable.

4. The trial court's amended judgment gave the City and Wallace a right of contribution against each other and denied either indemnification from the other. Since we have already held the City is bound by the court's original judgment and the court erred in applying comparative fault principles to Wallace, the question of the City's right to contribution remains.

In *City of Mounds View v. Walijarvi,* 263 N.W.2d 420 (Minn.1978), the Minnesota Supreme Court included the following discussion of professionals' liability:

> The majority position limits the liability of architects and others rendering "professional" services to those situations in which the professional is negligent in the provision of his or her services....
>
> ... Architects, doctors, engineers, attorneys, and others deal in somewhat inexact sciences and are continually called upon to exercise their skilled judgment in order to anticipate and provide for random factors which are incapable of precise measurement. The indeterminate nature of these factors makes it impossible for professional service people to gauge them with complete accuracy in every instance. Thus, doctors cannot promise that every operation will be successful; a lawyer can never be certain that a contract he drafts is without latent ambiguity; and an architect cannot be certain that a structural design will interact with natural forces as anticipated. Because of the inescapable possibility of error which inheres in these services, the law has traditionally required, not perfect results, but rather the exercise of that skill and judgment which can be reasonably expected from similarly situated professionals. As we stated in *City of Eveleth v. Ruble,* 302 Minn. 249, 253, 225 N.W.2d 521, 524 (1974):
>
>> "One who undertakes to render professional services is under a duty to the person for whom the service is to be performed to exercise such care, skill, and diligence as men in that profession ordinarily exercise under like circumstances."

*Id.* at 423–24 (footnote omitted).

In this case, Wallace undertook to provide adequate plans and specifications for the City's sewer project. In rendering these professional services, Wallace placed primary design responsibility on an individual who was not a registered professional engineer. Wallace agreed to draw as-built maps of the project after it was completed but never thought to check the as-built maps of the City in designing the project. They took no soil borings of the project area and conducted no other subsurface testing at all. They surveyed each intersection of the project, but recorded the presence of concrete in only two of the ten intersections where it was found. The plans Wallace supplied did not even denote a state highway was part of the project.

Expert testimony was not necessary to establish Wallace was negligent in performing its engineering services. The trial court properly concluded the City was entitled to contribution from Wallace. The amount of the contribution, however, cannot be determined on this record. We have already held the trial court's apportionment of fault was error so the percentages ascribed to Wallace, the City, and Zontelli are invalid. The trial court must redetermine the amount of contribution the City is entitled to in light of this decision.

### DECISION

Our March 5, 1984 order dismissing the City appeal as to all issues except contribution is reinstated. The trial court's application of comparative fault between Wallace and Zontelli is contrary to law and reversed. The trial court's award of contribution for the City is affirmed in principle but remanded for recalculation of the amount in light of this opinion.

Affirmed in part, reversed in part, and remanded.