ZONTELLI & SONS, INC., Respondent,

v.

CITY OF NASHWAUK, Appellant,

Robert R. Wallace &
Associates, Respondent,

and

American Fidelity Fire Insurance
Company, Intervenor,
Respondent.

Nos. C1–83–1933, C2–84–218.

Supreme Court of Minnesota.

Aug. 9, 1985.

As Clarified on Denial of Rehearing
Sept. 17, 1985.

William P. O'Brien, Duluth, for appellant.

M.T. Fabyanske, Robert J. Huber, St. Paul, for Zontelli & Sons, Inc.

O.C. Adamson, Laura S. Underkuffler, Minneapolis, for Wallace & Associates.

David H. Gregerson, Minneapolis, for American Fidelity Fire Ins. Co.

PETERSON, Justice.

This appeal arises from an action brought by respondent and cross-appellant Zontelli & Sons (Zontelli), the general contractor in a municipal storm sewer construction project for Nashwauk, Minnesota, against respondent and cross-appellant City of Nashwauk (city) and respondent Robert R. Wallace & Associates (Wallace), the project engineer, for additional compensation for extra work resulting from inaccu-racies in the plans and specifications upon which Zontelli based its successful bid. The trial court awarded damages to be divided under a comparative fault theory, holding the city and Wallace jointly and severally liable to Zontelli and granting the city a right of contribution against Wallace. The judgment was later amended to award Wallace a similar right of contribution against the city. All parties appealed. The court of appeals dismissed the city's appeal as untimely, reversed the trial court's apportionment of fault, and remanded for a determination of Wallace's liability for contribution. We reverse the issues before us.

Viewing the facts in the light most favorable to the verdict, as we must on appeal, they can be stated as follows: In 1977, the city contacted Wallace, a Hibbing engineering firm, to conduct a study of the city's sewage treatment requirements. Wallace prepared a report recommending that the city separate its storm and sanitary sewer systems. The report, with a preliminary statement of the project cost, was submitted for funding to the Iron Range Resources and Rehabilitation Board (IRRRB), which agreed to fund 100% of the project's estimated cost.

After IRRRB funding was obtained, Wallace and the city, on May 2, 1978, signed an "Agreement for Professional Services" in which Wallace contracted to engineer a new municipal storm sewer system. Bob Wallace, who had been the primary engineer for many sewer construction projects, had overall charge of the project. His son, Bruce Wallace, had primary design responsibility. Bruce was not a registered professional engineer at that time and had previously had comparable responsibility for only two sewer projects.

Most of the problems in this case arose because the plans Wallace prepared for use in soliciting bids for the sewer project substantially underestimated the amounts of concrete and other unsuitable materials that had to be removed during construction and failed to indicate the unusual charac-

teristics of these materials. The final plans also neglected to indicate that First Street, also known as Highway No. 65, is a state, not a city, highway.

Before preparing the plans, Bruce Wallace surveyed and inspected the project area. Bruce also requested "as-built" drawings from the city to ascertain the location of existing utilities. Very little additional research was done, however, and the trial court found that Wallace's witnesses were unable to explain where they obtained the information regarding the amounts of unsuitable materials and concrete. No subsurface investigation or soil borings were done by Wallace employees to ascertain the subsurface makeup. Bruce contacted neither the Minnesota Department of Transportation nor the Itasca County Highway Department to ascertain the makeup of state and county highways. He also failed to question either the Nashwauk city street commissioner or mayor about the amount of concrete or unsuitable materials under the streets, although either could have told Wallace precisely which part of the street was bituminous over concrete and that a great part of the city was built on "unsuitable materials" (muskeg and peat).

The plans and specifications were delivered to the Nashwauk City Council for review prior to the invitation for bids. No changes were made.

On January 16, 1979, the city advertised the project for bids. The project involved the separation of the sanitary and storm sewers, with the installation of sewer pipes and catch basins where needed. Some existing sewer pipes and catch basins were to be connected to the new system. The construction work consisted of digging trenches in the streets, installing storm sewer pipes, installing catch basins, and constructing an outfall ditch into which the pipes would drain out of town. The streets where pipe was to be laid had to be torn up, the pipe and catch basins installed, and the surface restored.

Because of the variable nature of many of the quantities involved, the bids for the project were to be submitted based on a unit-price contract. Each contractor had to assign unit prices to 21 separate items. Each unit cost was then multiplied by the estimated quantity to determine the total bid price. Unit prices were established for the following items, among others: granular backfill, bituminous surface restoration, and bituminous over concrete. Items which were not unit-price items, called incidental or "non-pay" items, were included wherever the contractor saw fit—for example, the cost of concrete removal, a non-pay item, was included in some other related, unit-price item, as was the cost of the removal of unsuitable materials.

The contractors had approximately 2 weeks to calculate bids. After learning of the advertisement, David Zontelli, the president of Zontelli & Sons, Inc.; Frank Kingsley, his superintendent and vice president; and Harley Hoffman, an independent contractor, went to Nashwauk to inspect the site. Because the streets were covered with snow, it was practically impossible to determine the composition of the street surfaces where the storm sewers were to be laid. Moreover, nothing in the bid specifications disclosed subsurface soil conditions. Zontelli employees made three test bores at suitable places but, unfortunately, the tests disclosed only clay, not that there had been corduroying of the subsoils to support the street system and that most of the city was built on unsuitable materials. No Zontelli employee contacted city employees or examined maps of the city to ascertain subsurface conditions.

David Zontelli, Kingsley, and Hoffman independently compiled nearly identical estimates of the cost of the project, which were used to prepare Zontelli's final bid of $335,944. When the city council opened the bids on February 5, 1979, Zontelli's was significantly lower than the seven others, which ranged to a high of $503,998.30, although two other bids were under $400,000. In addition, Zontelli's bid was lower than the $359,000 Wallace at that time estimated the project would cost. Because of this, Zontelli was allowed to recheck its bid

overnight. Zontelli confirmed its bid, and the city accepted it 1 month later, on Wallace's recommendation.

Zontelli's bid was more than 10% lower than the next lowest bid, even though four of the bids estimated a cheaper unit price for laying street pipe, which constituted approximately 80% of the total cost of the project. The trial court concluded that the sole reason why Zontelli's total bid was 10% lower than the other bids was because Zontelli had been able to negotiate a favorable subcontract with Aitkin Blacktop to do blacktop restoration at a cost of $23,395; the other bids for such restoration ranged from $70,900 to $123,600.

In late April 1979, Wallace received a permit from the State of Minnesota authorizing construction under Highway No. 65. At that time, Wallace was advised that the highway was scheduled for resurfacing in fall 1979 and therefore that all storm sewer work under the highway must be completed prior to resurfacing. Wallace was also notified by the state of additional requirements: the contractor must finish work on one intersection of Highway No. 65 before construction could begin on the next, and work sites must be cleaned up each night.

Because of these unanticipated state requirements, Zontelli had to begin project construction at Highway No. 65. This was not Zontelli's desired sequence of operation, since it was contrary to the usual construction plan of starting at the low side and bringing the grade up. In addition, one block of pipe on each street that intersected Highway No. 65 had to be done first, and Zontelli later had to work on each intersecting street to join with the pipe already laid. Nonetheless, Zontelli lodged no objection to this method of proceeding.

Construction began on June 5, 1979. Three days later Zontelli's crew discovered unexpected concrete underneath Highway No. 65. As construction continued, Zontelli found concrete under bituminous in other unexpected areas. Although the bid plans had indicated 450 square yards of concrete under only 1 street, including 2 intersections, Zontelli actually found 1,527.90 square yards of concrete under 2 streets and 10 intersections. Not only was there much more concrete than estimated, but whereas the plans indicated that it was located under a city street, it was actually under a state highway and 8–14 inches thick and reinforced with rebar and wire mesh. Zontelli first tried to break the concrete with a backhoe, which broke down. Two days later, Zontelli was able to rent a hydrohammer which successfully broke the concrete, but broke down itself almost daily.

Zontelli also found that the amount of unsuitable material to be removed was substantially understated and was, moreover, of a different quality than anticipated. Zontelli's borings had indicated that the subsurface soil was clay, which is suitable if dry. Besides clay, however, Zontelli encountered muskeg and peat on several streets, as well as logs, stumps, and slabs of materials that had been used to corduroy the peat and muskeg during construction of the original Nashwauk streets. All of these materials had to be removed and replaced with granular backfill. One thousand nine hundred and thirty-six cubic yards of backfill were actually required, compared with an estimated five hundred cubic yards.

These unanticipated factors encountered by Zontelli when it commenced work—noncustomary state requirements, extra unsuitable materials, and extra concrete—all increased the project's time and cost. The trial court concluded that the additional reinforced concrete "caused the most trouble of all," overworking the machinery and damaging trucks, including tires. This excess concrete also caused Aitkin Blacktop to back out of its favorable subcontract with Zontelli for blacktop restoration because Aitkin was not in the concrete business and was not equipped to handle the more extensive concrete restoration entailed by the increase in concrete.

The excess unsuitable materials and unanticipated state requirements also created difficulties. Not only were the unsuitable materials harder to remove than anticipa-

ted, but Zontelli had to pay four times the estimated cost for disposal of unsuitable materials because the concrete, reinforcement rods, and mesh caused problems at the disposal site. The unusual sequence of construction added 8 extra days to the project and resulted in drainage saturating the backfill, increased excavation around manholes, and difficulty joining the pipes in the middle of the project. Having to clean up the site each evening took an additional 1½ hours per day. Zontelli had other problems too—a shortage of operators, machinery breakdowns, and unexpected pre-existing utilities. All of this resulted in slower progress than estimated and additional expense.

Zontelli was reimbursed for additional units of work done pursuant to a "changed conditions clause" in the contract. Zontelli contended that this was insufficient to cover the actual cost of the extra work, however, and walked off the job for a 2-week period in late September and early October 1979 in an attempt to renegotiate compensation. Zontelli returned to work and by spring 1980 had completed the project with the exception of nine items enumerated on a "punch list." By the time of trial, not all of the "punch list" items had been completed.

Zontelli brought an action against Nashwauk and Wallace for damages totaling $240,745.09, claiming breach of contract, breach of warranty, and negligence. The city and Wallace denied Zontelli's claims and contended that, in any event, Zontelli's remedies were limited to those provided in its contract with the city. Wallace cross-claimed against the city for contribution or indemnity; the city counter-claimed against Zontelli for breach of contract. At trial, the city asserted a cross-claim against Wallace for contribution or indemnity, but agreed to dismiss its counterclaim against Zontelli.

The trial court awarded Zontelli its actual damages, broken down as follows:

| | |
|---|---|
| Extra work attributable to unanticipated concrete | $185,388.13 |
| Extra work attributable to unsuitable materials and granular backfill | $14,731.05 |
| Extra work attributable to unanticipated state requirements | 32,408.31 |
| Retainage | 6,000.00 |
| Riprap | 2,217.60 |

The court then concluded that all of the parties had been negligent: Wallace in failing to contact the city and state while preparing the plans, the city in not checking the plans more carefully, and Zontelli in not questioning city officials prior to making its bid and in failing to mitigate damages. Determining that the contractual provisions limiting damages were unconscionable and that the primary allegations in the complaint were in tort, the court apportioned comparative fault for these damages as follows:

| | |
|---|---|
| City | 15% |
| Wallace | 60% |
| Zontelli | 25% |

The city and Wallace were held jointly and severally liable for their combined 75% ($174,395.61), and the city was given a judgment against Wallace for any amount paid in excess of $34,879.12. In response to a post-trial motion by Wallace, the judgment was amended to grant Wallace's claim for contribution against the city, for any amount paid in excess of $139,516.49. All parties appealed.

The court of appeals, 353 N.W.2d 600 (1984), first dismissed the city's appeal of all except the contribution issue as untimely. Determining that all of Zontelli's claims were rooted in the contract, not in tort, the court vacated the trial court's apportionment of fault. The court upheld the city's right of contribution from Wallace, however, and remanded for a determination of the amount under a contractual, not comparative fault, theory of damages. Motions for clarification were submitted by all parties, but these motions were denied after this court granted further review.

1. The first issue presented by this appeal is whether the court of appeals properly dismissed the city's appeal as untimely. The original judgment was issued September 18, 1983; it was amended November

15, 1983; the city filed its appeal on January 31, 1984.

◼ We hold that the city's appeal was timely. Under Minn.R.Civ.App.P. 104.01, the 90-day period for appeal of a judgment adjudicating fewer than all the claims or the rights and liabilities of all the parties "shall not begin to run until the entry of a judgment which adjudicates all the claims and rights and liabilities of the remaining parties." *Id., see also* Minn.R.Civ.P. 54.02 (judgment upon multiple claims). Wallace cross-claimed against the city for indemnity or contribution, but the September 18 judgment made no determination of this claim; it was disposed of by the amended judgment. Since the September 18 judgment did not adjudicate all the claims of all the parties, the time for appeal did not begin to run until the November 15 amended judgment was issued.

◼ 2. Because of our decision that the city's appeal was timely, we have the option of remanding to the court of appeals to decide the city's liability to Zontelli or addressing the issue here. In the interests of judicial economy, we will address the issue here.

◼ As the court of appeals correctly determined, the city's liability to Zontelli is contractual because the city's duty to reimburse Zontelli for extra work arises out of the contract, a determination not contested on appeal to this court. *See, e.g., Lesmeister v. Dilly,* 330 N.W.2d 95 (Minn.1983). The parties provided for reimbursement of such extra work by including a "changed conditions" clause in Paragraph 17:

17. SUBSURFACE CONDITIONS FOUND DIFFERENT

Should the Contractor encounter subsurface and/or latent conditions at the site materially differing from those shown on the Plans or indicated in the Specifications, he shall immediately give notice to the Engineer of such conditions before they are disturbed. The Engineer will thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the Plans or indicated in the Specifications, he will at once make such changes in the Plans and/or Specifications as he may deem necessary, and *any increase or decrease of cost resulting from such changes to be adjusted in the manner provided in Paragraph 13 of the General Conditions.*

(emphasis added). Paragraph 13 of the General Conditions provides:

13. CHANGES IN WORK

No changes in the work covered by the approved contract documents shall be made without having prior written approval of the Owner. Charges or credits for the work covered by the approved change shall be determined by one or more, or a combination of the following methods:

(a) Unit bid prices previously approved.

(b) An agreed lump sum.

(c) The actual cost of:

(1) Labor, including foremen;

(2) Materials entering permanently into the work;

(3) The ownership or rental cost of construction plant and equipment; (sic) during the time of use on the extra work;

(4) Power and consumable supplies for the operation of power equipment;

(5) Insurance;

(6) Social security and old age and unemployment contribution.

To the cost under (c) there shall be added a fixed fee to be agreed upon but not to exceed fifteen percent (15%) of the estimated cost of the work. The fee shall be compensation to cover the cost of supervision, overhead, bond, profit, and any other general expenses. It shall be the Owner's option to select whichever method of the three outlined above that will be used in computing the payment for extra work.

The contract also contains the following provision:

32. QUANTITIES OF ESTIMATES

Wherever the estimated quantities of work to be done and materials to be furnished on a unit price basis under this contract are shown in any of the documents including the proposal, they are given for use in comparing bids, and the right is expressly reserved, except as herein otherwise specifically limited, to increase or diminish them as may be deemed reasonably necessary or desirable by the Owner to complete the work contemplated by the contract, and such increase or diminution shall in no way vitiate this contract, nor shall any such increase or diminution give cause for claims or liability for damages.

■ Zontelli's claim for extra work that arose because the actual quantity and quality of concrete and unsuitable materials differed from that shown on the plans is clearly compensable under these provisions of the contract. The status of Zontelli's claim for extra work necessitated by state requirements is less clear as, unlike the other claims, it is not one which is the result of "changed subsurface conditions" covered by Paragraph 17. The contract fails to indicate which party bore the risk of this unanticipated occurrence. The trial court, however, concluded that Wallace could easily have learned of these requirements and indicated them on the specifications. Zontelli, on the other hand, had no duty to investigate and, in fact, had the right to rely on the specifications in making its bid. *Alley Constr. Co. v. State*, 300 Minn. 346, 349–50, 219 N.W.2d 922, 924–25 (1974); *McCree & Co. v. State*, 253 Minn. 295, 91 N.W.2d 713 (1958). Accordingly, we conclude that the most reasonable interpretation is to allocate this risk to the city, not to Zontelli. *See* Restatement (Second) of Contracts § 154 (1981). Compensation for this extra work, as for Zontelli's other claims, is computed pursuant to Paragraph 13, which governs extra compensation for all "changes in work covered by the approved contract," not just those compensible pursuant to Paragraph 17.

■ We next must determine the proper measure of compensation. Items that are not unit-price items are compensable under the "actual cost" provision of Paragraph 13(c). As to the two unit-price items, bituminous-over-concrete restoration and removal of unsuitable materials,[1] the city chose to reimburse Zontelli under Paragraph 13(a) based upon unit prices previously approved, which the contract provides may not be increased.[2]

Use of previously-approved unit prices, however, severely undercompensates Zontelli: because of unanticipated subsurface conditions Zontelli lost a favorable subcontract for bituminous restoration with Aitkin Blacktop, increasing the project's cost over $52,000,[3] and underestimated the cost of removing unsuitable materials by at least $12,000. Accordingly, Zontelli contends that under the extreme circumstances of this case, the contractual provisions allowing the city to choose to compensate Zontelli for these items based upon the previously-approved unit price and prohibiting an

---

1. Although removal of unsuitable materials is not listed as a unit-price item in the contract, the unit price listed for granual backfill, which is used to replace unsuitable materials, includes the estimated cost of removal of unsuitable materials. In its bid, Zontelli assumed that the amount of backfill would be roughly comparable to the volume of unsuitable materials.

2. Specifically, the contract states:
 The Bidder also agrees that the Owner has the right to change the quantities of any bid item. If the bid quantities are increased or decreased by less than 50 percent there shall be no change in the unit prices as bid. In the event that the increase or decrease in quantity is 50 percent or more, the unit prices may be renegotiated; (sic) except that an increase in quantities shall not be a cause for a renegotiation of a higher bid price.

3. Wallace claims that Zontelli should have forced Aitkin to perform its subcontract. Because of a mutual mistake, the job Aitkin had bid and contracted for was materially different from and much costlier than the job it confronted, relieving Aitkin from its duty to perform the subcontract. *Stanton v. Morris Constr. Co.*, 159 Minn. 380, 384, 199 N.W. 104, 106 (1924).

increase in this unit price are unconscionable.

■■■■ A changed-conditions clause, such as that included in this contract, is designed to benefit both the government-owner and the contractor: the contractor receives extra compensation if adverse subsurface conditions are encountered, and the government-owner benefits because contractors no longer need to add large contingency sums to their bids to cover the risk of encountering adverse conditions. *See Metropolitan Sewerage Comm'n v. R.W. Constr., Inc.*, 72 Wis.2d 365, 371, 241 N.W.2d 371, 377 (1976). Consistent with this, the intent of contractual provisions authorizing compensation for this extra work is presumably to compensate the contractor adequately for the types of changed conditions that commonly arise in construction projects.

■■■■ In the ordinary project, the provisions this contract contains providing for extra compensation—including those allowing the city to choose the measure of compensation and prohibiting an increase in previously-approved unit prices—would carry out this intent to the satisfaction of all parties. This is an extreme case, however, with all kinds of overruns and otherwise changed conditions, the extent and effect of which are so unusual as not to have been contemplated by the parties at the time of contracting. *Cf. Lanesboro Produce & Hatchery Co. v. Forthun*, 218 Minn. 377, 380–81, 16 N.W.2d 326, 327–28 (1944) (holding that special damages were so inevitable that they must have been within the "contemplation of the parties had they contemplated a breach"). Had the parties contemplated this extreme situation, it cannot be presumed that Zontelli would have agreed to provisions that so limit its compensation, and had Zontelli agreed, the situation would raise questions of unconscionability. Accordingly, we conclude that in this instance the "actual cost" method of compensation provided by Paragraph 13(c), not the "unit price" measure, most appropriately carries out the parties' intent and should be used.

■■■■ The trial court awarded Zontelli the actual cost of the extra work, but without regard to the formula encompassed in Paragraph 13(c) of the contract. Its computation, however, encompassed the same items that Paragraph 13(c) requires be included in computing "actual cost": labor, equipment, fuel, materials, insurance, and social security and unemployment taxes. Moreover, the method used—deducting the number of days Zontelli estimated in its bid for each portion of the project from the number of days the job actually took, and then multiplying that figure by the estimated cost per day—provides an estimate of the actual cost of the extra work consistent with contractual requirements. The trial court's computations therefore provide an appropriate basis for determining the cost of the extra work as prescribed by Paragraph 13(c) of the contract. The trial court's award must be adjusted, however, to comply with the contractual provision limiting overhead and profit to 15% of the estimated cost of the extra work.

Certain costs allowed by the trial court have been challenged as improper. Each challenged determination is one of fact which, like most items in this case, was the subject of conflicting testimony, and an examination of the record satisfies us that the trial court made no clear errors requiring reversal. *See Austin v. Rosecke*, 240 Minn. 321, 322–23, 61 N.W.2d 240, 242 (1953). We similarly reject the claim that damages are too speculative, since Zontelli proved a reasonable basis upon which to approximate the amount. *See, e.g., Leoni v. Bemis Co., Inc.*, 255 N.W.2d 824, 826 (Minn.1977); *Northern States Power Co. v. Lyon Food Prod., Inc.*, 304 Minn. 196, 202–03, 229 N.W.2d 521, 525 (1975).

Accordingly, we conclude that Zontelli is entitled to the following extra compensation under Paragraph 13(c) of its contract with the city:

Trial court's computation of
cost of extra work:

| | | |
|---|---|---|
| Concrete removal | $185,388.13 | |
| Unsuitable materials | 14,731.05 | |
| State requirements | 32,408.31 | |
| | $232,527.49 | |
| Less overhead and profit included in trial court's computation [4] | (34,461.60) | |
| Actual cost of extra work | | 198,065.89 |
| Plus 15% overhead and profit | | 29,709.88 |
| Total due to Zontelli for extra work [5] | | $227,775.77 |

**3.** The trial court determined that Zontelli was responsible under a comparative fault analysis for 25% of the damages it had suffered. In making its determination, however, the trial court relied primarily upon two factors that are inappropriate to support a finding of either fault or a failure to mitigate damages. First, the court cited Zontelli's failure to investigate conditions prior to submitting its bid, but a contractor is entitled to rely on the plans and specifications furnished by the owner and has no duty to investigate independently. *McCree*, 253 Minn. 295, 91 N.W.2d 713; *Stanton v. Morris Constr. Co.*, 159 Minn. 380, 199 N.W. 104 (1924). Second, the court cited Zontelli's failure to refuse to proceed with the project and its failure to demand renegotiation when the extent of the changed conditions became apparent, but a review of the record exposes no evidence either that this would be a "reasonable effort within [Zontelli's] power to minimize damages," *Lanesboro Produce & Hatchery Co.*, 218 Minn. at 382, 16 N.W.2d at 328, or that any reasonably ascertainable amount of damages would have been avoided. *Id.;* 22 Am.Jur.2d *Damages* § 297 (1965). Similarly, the record does not allow determination of an ascertainable amount of damages attributable to two less important factors

noted by the trial court: that Zontelli's president was seldom at the job site and that Zontelli was trying to do too many jobs at once.

We do uphold, however, the trial court's determination that Zontelli is liable for $5,000 for its failure to complete satisfactorily all of the work it contracted to do. The trial court concluded that some of Zontelli's curb work was unsatisfactory and had to be redone. In its bid, Zontelli estimated the total cost of curbs and gutters at $6,960. While the trial court did not detail the basis for its $5,000 award, it is clear that a substantial amount of curb work had to be redone, and an award of slightly more than two-thirds of the amount bid for this task does not on this record appear to be unreasonable.

**4.** The final issue to be resolved is the extent of Wallace's liability. Initially, we reject Wallace's claim that it has no liability because it has not been proved negligent. Wallace drastically underestimated the quantity of concrete and unsuitable materials to be removed; failed to indicate the unusual characteristics of these materials; misrepresented Highway No. 65 as a municipal, instead of state, highway, misleading bidders as to the thickness and strength of the concrete shown on the

---

**4.** In addition to the $34,382.66 overhead and profit allowed by the trial court, this figure includes $78.94 erroneously allowed by the trial court because of an addition error in the figures submitted by Zontelli.

**5.** The city also owes Zontelli $6,000 retainage and $2,217.60 for riprap, if those amounts have not yet been paid.

plans to be under it; and failed to indicate that construction was governed by unexpected state requirements. Knowledge of these factors would have greatly influenced amounts bid for the project and, in fact, the factors increased the project cost almost $300,000 from Wallace's own pre-project estimate of approximately $359,000. The record indicates, moreover, that had Wallace made even preliminary inquiries, it could have avoided these inaccuracies. In view of these considerations, the trial court was justified in concluding, without expert testimony, that the care, skill, and diligence exercised by Wallace in this project was less than that normally exercised by a member of the engineering profession and that Wallace therefore was negligent. *See Kostohryz v. McGuire*, 298 Minn. 513, 517, 212 N.W.2d 850, 854 (1973); *see also City of Eveleth v. Ruble*, 302 Minn. 249, 253–55, 225 N.W.2d 521, 524–25 (1974).

 The city cross-claimed for contribution or indemnity from Wallace, contending that its liability to Zontelli was attributable to these negligent actions by Wallace. In its contract with the city, Wallace promised to, "in a satisfactory and proper manner * * * [p]rovide sufficient plans, specifications, bid sheets, cost estimates, design analysis, and other contract documents required by the project," and the city's liability to Zontelli is primarily attributable to Wallace's breach of this promise. A party is entitled to be indemnified for its liability "[w]here the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged." *Tolbert v. Gerber Indus., Inc.*, 255 N.W.2d 362, 366 (Minn.

1977); *Hendrickson v. Minnesota Power & Light Co.*, 258 Minn. 368, 373, 104 N.W.2d 843, 848 (1960). Thus, this situation provides a basis for indemnity.[6]

 Indemnity usually requires that one party reimburse another entirely for its liability. *Id.* at 370, 104 N.W.2d at 846–47. Indemnity is, however, an equitable doctrine that does not lend itself to hard-and-fast rules, and its application depends upon the particular facts of each case. *Farr v. Armstrong Rubber Co.*, 288 Minn. 83, 96, 179 N.W.2d 64, 72 (1970). Since under the facts of this case indemnity is appropriate because Wallace breached its contractual duty to the city, the city should be indemnified only for those costs attributable to this breach, even if less than the city's total liability to Zontelli.

 Wallace contends that the entire extra cost of the project is attributable not to its breach of its duty to provide sufficient and satisfactory plans but, rather, to the existence and character of the concrete, unsuitable materials, and state requirements, factors which would have increased the cost for performance of the contract by the same amount, regardless of whether they were known of in advance. The record supports this claim as to the extra cost resulting from Aitkin Blacktop's withdrawal from its subcontract—this withdrawal was clearly attributable solely to the presence of additional concrete.[7] Although Aitkin would never have accepted the subcontract had Wallace's plans and specifications indicated the actual amount of concrete, the record does not support a

6. Although we have previously recognized indemnity to reimburse a party only for a liability arising from a tort, the principles underlying the rules are the same for a liability arising out of a contract. Restatement of Restitution § 85 (1937).

7. In his letter withdrawing from the project, Aitkin Blacktop's president stated:

 You probably already know that the concrete restoration required is going to be a great deal more than I had planned. It looks to me to be three or four times more than the 450 sq. yds. I quoted to you.

 As you know I am not in the concrete business and this increase in concrete restoration completely changes the job as far as I am concerned. I was prepared to put in 1 block and 2 intersections to get the rest of work but now there is something like 10 intersections and 2 blocks which is more than I can handle.

 Please be advised that due to the changes in the job and in accordance with provisions in the bid proposal I am withdrawing my bid to you on both Item 16 and Item 17.

finding that not knowing of the extra concrete in advance increased the restoration expense. There is no evidence that Zontelli would have been able to obtain a less expensive subcontract than it actually did—the other contractors bid approximately what Zontelli ultimately paid for this particular task—and the amount of funds that IRRRB actually awarded to the city for the project more than cover this extra amount, defeating any claim that had the city known of this particular additional expense, it would not have undertaken the project. Under the circumstances, it would be inequitable to charge Wallace with the $52,505.92 attributable to Aitkin's withdrawal because there was no loss to the city by reason of Wallace's actions.

The same cannot be said about the remainder, however. The city has proved its damage to the extent that it contracted to build a sewer for $336,000 but, because of Wallace's gross errors, had to pay $300,000 more than anticipated for the same sewer.[8] Although Wallace contends that the remaining extra cost is similarly attributable to physical conditions, the record neither supports this nor allows determination of an ascertainable amount. Furthermore, there is no evidence that the city would have built the sewer at this time or perhaps at all had it been aware that the cost would be so much greater; indeed, some affirmative evidence suggests that the city might have delayed the project to avoid state requirements stemming from the planned resurfacing of Highway No. 65. Under the circumstances, Wallace bore the burden of establishing that its breach of its contractual duty to the city was not the cause of the city's additional liability, and Wallace has not satisfied this burden. Accordingly, we conclude that Wallace must indemnify the city for the entire cost of the additional work ($227,775.77), less

the amount attributable to the Aitkin subcontract ($52,505.92), or $175,269.85.[9] Thus, the determinations of the trial court and the court of appeals that contribution rather than indemnity is the appropriate remedy are reversed.

Reversed and remanded to the court of appeals with direction that upon remand to the district court, an amended judgment be entered consistent with this opinion.

COYNE, J., took no part in the consideration or decision of this case.

---

8. In addition to the extra compensation sought here, the city has paid Zontelli approximately $70,000 more than it bid, primarily for completion of extra units of work.

9. Zontelli sued both the city and Wallace; the city cross-claimed against Wallace. We are

awarding Zontelli compensation from the city and granting the city indemnity from Wallace. We need not decide, therefore, whether Zontelli has a direct action against Wallace for negligent misrepresentation because the practical result would be the same in any event.